**TIMOTHY A. SCOTT**, SBN 215074
**MARCUS S. BOURASSA**, SBN 316125
McKenzie Scott PC
1350 Columbia Street, Suite 600
San Diego, California 92101
email:      tscott@mckenziescott.com
                mbourassa@mckenziescott.com

Attorneys for Daniel Dasko

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br>　　　　Plaintiff,<br><br>vs.<br><br>Daniel Dasko,<br>　　　　Defendant. | Case No. 3:22-cr-1715-LL<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

Daniel Dasko committed a very serious crime. He admitted it on the day of his arrest. He admits it frequently in ongoing sex offender treatment. He expects to be subject to close supervision for most, if not all, of his remaining life. He will register as a sex offender for the remainder of his life. The stink of this offense will cling to him forever and he can never undo the things he did at his home computer.

Mr. Dasko is assured of a long sentence. But someday he will be a member of our community again. His post-offense rehabilitation, the history of the guidelines, research on recidivism among sex offenders, the need to avoid unwarranted disparities, and the life-expectancies of his support network all militate in favor of a below guidelines sentence. The Court's task is to determine how long is the minimum necessary before he can commence his lifelong supervision and registration. The Court should allow Daniel Dasko to reenter society (subject to close supervision) around the year 2030, rather than 2040.

# Contents

I.   **The Defendant**...................................................................................3

   A....Daniel Dasko immediately wanted and sought sex offender treatment, to which he has since committed himself. ......................................................4

   B. The production here was not a paradigmatic 'hands-on' offense and was led by others. ...................................................................7

   C. The crime occurred under unusual circumstances Mr. Dasko is well-prepared to avoid and mitigate in the future. ...............................................8

II.  **The Production Guidelines Under 2G2.1 Apply, But Should Be Given Less Weight than in Other Cases.**...................................................10

   A.... The sentencing guidelines applicable here are unique in that they are not the product of the Sentencing Commission's institutional expertise. .......10

   B. The heartland of production cases to which 2G2.1 historically applied involved hands-on crimes. ...........................................................13

   C. Strict application of 2G2.1 without variance would punish Mr. Dasko's crime more harshly than serious violence and rape offenses. ..................16

   D...........Mr. Dasko proposes a sensible compromise downward variance that respects Congressional mandates about the appropriate sentencing of production cases and avoiding an unwarranted sentencing disparity........19

III. **Mr. Dasko Poses a Low-Risk of Reoffending and a Guideline Sentence Would Produce a Sentencing Disparity Rather than Avoid One**. 23

   A. Mr. Dasko poses a low-risk of reoffending. ..............................................23

   B. A Guideline sentence would result in a sentencing disparity....................25

   C. Mr. Dasko's work as a teacher does not make him unique. An 84-month sentence is normal in such cases...............................................28

IV.  **Conclusion** ...............................................................................30

2

## I.    The Defendant

Unlike many defendants, especially those who committed child pornography offenses, Daniel Dasko does not minimize his offense or get defensive in discussing it:

> I chose to do terrible things. I share their anger, sadness, regret, frustration, confusion, and sense of betrayal when I look in the mirror. [. . .] I am committed to improving myself as a person so that someday my community can feel safe with me in it.

Dasko Letter. This is the fruit of sex offender treatment he has pursued since his release on bond approximately one year ago, but it also reflects his own insight.

On the day of his arrest, Daniel confessed. Discussing what happened, he described his own behavior as an addiction and explained that he'd had a therapist in the past but had never told anyone about his interest in material involving adolescent boys. He'd been confronted by law enforcement before, and he was aware that Mr. Strange and Mr. Wolf had been arrested in Pennsylvania and New York. Still, after a brief hiatus, he'd struggled to control his impulsive pursuit of sexually explicit material involving minors.

This time, when confronted, Mr. Dasko sought to help the FBI catch others:[1]

I, _Daniel Dasko_____, hereby voluntarily authorize _Daniel Evans_____ or other agents of the FBI to assume and use my (or my minor child's) "online identity". I give this consent freely and voluntarily, without fear, threats, coercion, or promises of any kind. I have been advised of my right to refuse to allow the FBI to assume my (or my minor child's) online identity, and I hereby voluntarily waive this right. This online identity includes the following screen name(s), aliases and/or nickname(s), and/or e-mail addresses, as well as the passwords associated with these accounts:

ACCOUNT NAME                              PASSWORD

_Telegram Account: Mr Pickles_          ███████████

---

[1] These efforts appear to have come to nothing, presumably because Mr. Dasko lacked contacts or communications likely to bear investigative fruit other than men the FBI had already arrested.

Bourassa Decl. ¶ 6.

He told the agents "[m]aybe I'll look back and see this as being for the best." *Id.* ¶ 7. Already, he sees his arrest as a positive development, "I'm thankful I was arrested because it stopped my behavior and enabled me to realize the hurt I was causing." Dasko Letter. Alongside relatives, he has submitted a letter here as well as a separate statement to his victims, either of which he may seek to read aloud during allocution. He has lost virtually all of his friends as a result of this offense and forthcoming prison sentence.

## A. Daniel Dasko immediately wanted and sought sex offender treatment, to which he has since committed himself.

From the outset of the case, the Government argued Mr. Dasko was too much of a danger to the public to be released and effectively supervised. But the undersigned counsel submitted a broad swath of academic and original research and data on the risks associated with offenders like Mr. Dasko.[2] The Court granted

---

[2] *See generally* dkt. no. 18 ("defendants subject to such conditions routinely do better on pretrial release than the general population of low-risk, federal defendants released on bond because of their common characteristics and the Court's ability to substantially mitigate the risk of new or continuing offenses") (citing, inter alia, Timothy P. Cadigan, James L. Johnson & Christopher T. Lowenkamp, T*he Re-Validation of the Federal Pretrial Services Risk Assessment (PTRA)*, Fed. Probation (September 2012), at 12 (revealing only 1.3% risk of FTA or new crime, the lowest measured risk of all offenders); Marie VanNostrand, Ph.D., Gena Keebler, *Pretrial Risk Assessment in the Federal Court*, Federal Probation Volume 73 No 2 (September 2009) (offenders subject to sex offender treatment and computer monitoring are 25% less likely to be rearrested); James Byrne, *New Defendants, New Responsibilities: Preventing Suicide among Alleged Sex Offenders in the Federal Pretrial System*, Federal Probation Volume 73 No 2 (September 2009) at 4 ("federal sex crime defendants – mostly charged with pornography offenses . . . are at low risk for re-offending or failure to appear"); Mark Motivans, Ph.D., and Tracey Kyckelhahn, *Federal Prosecution of Child Sex Exploitation Offenders*, 2006, Bureau of Justice Statistics Bulletin, U.S. Department of Justice (December 2007) at 3 (defendants charged with sexual exploitation offenses "had lower rates of violation and revocation than violent, drug, weapons, and immigration defendants."); dkt. no. 18-2 (Bourassa Declaration) (observing that of all 54 child exploitation defendants released on bond since 2015 in S.D. Cal., "[n]one had dangerous interactions with minors" and only one committed a new crime, a DUI).

pretrial release.

While that litigation was ongoing, there was substantial uncertainty about what prospective settlement might, or might not, be reached. From the outset, Mr. Dasko was adamant that, whatever happened in the substance of the case, he wanted to pursue sex offender treatment for himself. Bourassa Decl. ¶ 7. His immediate desire for mental health treatment to address his actions was such that the undersigned counsel was concerned he would pursue it even if it meant increasing his risk of conviction. *Id.* Counsel advised Mr. Dasko *not* to discuss his desire for sex offender treatment over the phone, even obliquely, and not to discuss it with MCC's resident counselors and therapists out of concern that treatment or treatment requests might be interpreted as evidence of deviant sexual interests or behaviors before understanding the likely outcome in the case or its admissibility. *Id.*

Even though he understood the profound risks if the case proceeded to trial, Mr. Dasko did not heed counsel's advice. Almost immediately his family began telling counsel that Mr. Dasko was eager to get sex offender treatment and inquiring how he could obtain it at MCC. *Id.* As his brother notes in his letter, the first thing Daniel said to his family from jail was "that he wanted 'to get better.'" Nick Dasko Letter. In one recorded jail call, Mr. Dasko tearfully explained to his mother "I need the help and I want the help." Bourassa Decl. ¶ 7. When the Court granted bond, Mr. Dasko's response – recorded from jail – was:

> Dasko: "I'm just glad I get a chance to fix things. That's the most important thing."
> Mother: "In terms of your mental health?"
> Dasko: "100 percent."

*Id.* These were Mr. Dasko's insights and desires at a time when counsel was advising him his case might proceed to trial and that it was imperative he do nothing

that could generate new, inculpatory evidence. *Id.*

Upon release, Mr. Dasko ably committed himself to his own mental health. Seeking care on his own from his ordinary providers, he was promptly diagnosed with both generalized anxiety disorder and depression. Bourassa Decl. ¶ 8.[3] He also began attending sex offender treatment through Dr. Reavis's office. As of this writing he attends weekly group sessions, weekly individual sessions, and additional individual sessions every other week. Doctor Belfy Letter.[4] In all, he has had approximately 100 sex offender treatment sessions over the past year and has completed dozens of written assignments reflecting on how he hurt others and can avoid the modes of thinking and decision-making that facilitated his crime. Bourassa Decl. ¶ 8.

Dr. Belfy describes him as "a patient in good standing" who has "used his time in treatment well." Doctor Belfy Letter. She continues:

> He accepted responsibility for his offense behavior, demonstrated emotional sensitivity towards the persons he hurt, engaged in general group discussion, completed written assignments, and provided his peers with feedback on their work.

*Id.*

His brother has observed similar, positive developments in sex offender treatment:

> With the help of Daniel's therapist, my mother, Dan, and, I have been able to have more open discussions [. . .] He is open about his sexual addiction, compulsions and what he is doing to combat them including the work he does in his groups, alone, and with therapists. We are able

---

[3] The PSR asserts that the supporting medical records indicate these conditions began in November 2022. That is incorrect. They were diagnosed in November 2022.

[4] At the time counsel obtained a status update from the therapist, Mr. Dasko was attending weekly individual sessions. As his mother notes, Mr. Dasko then "added two more therapy sessions per month to get additional support." Elyse Dasko Letter.

*DEFENDANT'S SENTENCING MEMORANDUM*

to discuss treatment options including medications. [. . .] Daniel and I now speak on daily basis. He has shown me the manuals he works from in counselling and therapy, and we discuss his treatment and the progress he is making. [. . .] We have spent hours looking at various SOMP facilities and their programs. He has spoken at length with people in his therapy group about these programs because he is committed to getting the most out of their programs.

The treatment programs he has been a part of over the past year have been tremendously effective and have given my brother a future.

Nick Dasko Letter. His mother echoes that sentiment, "What he has learned from the support programs, and particularly his individual therapist, is that people and expertise can help." Elyse Dasko Letter.

### B. The production here was not a paradigmatic 'hands-on' offense and was led by others.

The presentence report ably describes and recounts some of Mr. Dasko's most disturbing communications with Andrew Wolf and Kray Strange. In general, the defense has described the offense conduct in support of Mr. Dasko's objection to the presentence report. *See generally* dkt. no. 75. A few additional circumstances are worthy of the Court's consideration in determining an appropriate sentence.

Primarily, Mr. Dasko has never committed a hands-on production offense. That is in stark contrast to Mr. Wolf and Mr. Strange. In their oft-quoted Telegram chat, Mr. Wolf told Mr. Dasko he had physically "jerk[ed] off a boy, or suck[ed]" a minor. Bourassa Decl. ¶ 7. Similarly, Mr. Strange was "already a repeat hands-on sex offender."[5] Wolf and Strange "developed [the] catfishing scheme" together and baited the victims.[6] The two, independent of Mr. Dasko's involvement, maintained

---

[5] *U.S. v. Strange*, 22-cr-35-MAK (E.D. PA), dkt. no. 86 at 1 (USA Strange Sentencing Memorandum).

[6] *U.S. v. Wolf*, 22-cr-35-MAK (E.D. PA), dkt. no. 74 at 3 (USA Wolf Sentencing Memorandum).

*DEFENDANT'S SENTENCING MEMORANDUM*

an excel spreadsheet of victims and prospective victims. They also recruited others in addition to Mr. Dasko. Their communications were approximately 6 times longer than their chat thread with Mr. Dasko and involved a far larger number of images and videos. Other confederates committed hands on offenses like penetrative sex and touching while sharing the resultant explicit imagery and videos with each other. *See, e.g., id.* at note 3. Simply put, all three men committed terrible crimes, but Mr. Wolf and Mr. Strange were operating on a different scale and their personal conduct was different from Mr. Dasko.

As Mr. Dasko explained in their private chat, "ive only done stuff online." Bourassa Decl. ¶ 7. Not only would he have had little reason to minimize his contact with minors under the circumstances of that exchange,[7] but Mr. Dasko explained the same boundary in discussing the crime with the FBI on the day of his arrest. *Id.* Mr. Dasko's crime was very serious, traumatizing, troubling, and blameworthy. His was also an internet-based offense committed remotely via conspiracy with others. Any speculation or conjecture to the contrary has no place in sentencing here. *United States v. Borrero-Isaza*, 887 F.2d 1349, 1352 (9th Cir. 1989); *United States v. Safirstein*, 827 F.2d 1380, 1384-85 (9th Cir. 1987).

**C. The crime occurred under unusual circumstances. Mr. Dasko is well-prepared to avoid and mitigate in the future.**

Mr. Dasko acted of his own volition and does not purport to have been "lured into this world," as the Government frames it in its memorandum. However, as the Court is aware, criminal decisions always occur in surrounding context, some of which can be mitigating. The surrounding context also informs future risks and appropriate sentences.

Perhaps unsurprisingly, Mr. Dasko's most physically and emotionally taxing

---

[7] On the contrary, since the two ordinarily discussed sexual fantasies about minors, both had an incentive to engage in hyperbole and exaggerate reprehensible fantasies.

*DEFENDANT'S SENTENCING MEMORANDUM*

period of life was his own adolescence. Mr. Dasko's father was "an emotionally challenging person," who converted "what should have been normal activities" into "nightmarish screaming sessions that made us anxious, frightened," and in need of therapy. Nick Dasko Letter. As an adolescent boy himself, Mr. Dasko suffered a growth hormonal deficiency that required daily steroid injections from ages 13 to 15. In the same period of his life, for 18 months, Mr. Dasko's dad battled a brain tumor. PSR ¶ 90. Before he died, Mr. Dasko's dad "mostly ignored" him. Nick Dasko Letter.

As his brother notes, by college, Mr. Dasko struggled to connect with his roommates. *Id.* "Daniel, it seemed had missed a personal growth milestone. [. . . and] ever since he left high school, he seemed like much more of an outsider than his younger self." *Id.* He began experiencing anxiety disorder and depression.

Mr. Dasko lived alone and his family wondered for years if he was sexually normal. *Id.* But, Mr. Dasko did not seek healthy outlets or discuss his inner thinking. Instead, "he just buried all the confusion and questions he had of himself." *Id.*

Mr. Dasko's offense began early in the pandemic, when his pre-existing social isolation was exacerbated, and life moved predominantly online. PSR ¶ 4 (earliest NCMEC alert was September 2020); ¶ 6 (chats with Wolf and Strange began October 2020). At the same time, Mr. Dasko sought out sexually explicit materials of minors online and met Mr. Wolf and Mr. Strange. He was not duped. He was a willing participant. However, given his surrounding circumstance and secret proclivities, communications with Mr. Wolf and Mr. Strange became a space in which he simultaneously sought and received social acceptance.

As he remarks now, "I wish I had used my family as more of a support before I committed my crime rather than unfairly leaning on them after I have already hurt so many others." Dasko Letter. As noted above, Mr. Dasko has since thrown himself into his treatment regimen. He looks forward to continuing his treatment in prison.

His mother and brother note multiple, laudable traits as well. He never

hesitated in donating his kidney to save his mother, something that was already planned before his arrest. His family describes many instances in which he has demonstrated and continues to demonstrate kindness, selflessness, dedication, and growth. This offense is not the sum or substance of his life, but a feature.

## II.   The Production Guidelines Under 2G2.1 Apply But Should Be Given Less Weight than in Other Cases.

Mr. Dasko agrees that, because he was involved in efforts to catfish minors into photographing or producing videos of themselves, the guidelines for a production offense apply. The resulting guideline range places him near his statutory maximum. However, for at least three independent reasons, that guideline range should be given little weight. Ultimately, Mr. Dasko proposes a variance under the guidelines which would avoid an unwarranted sentencing disparity while nonetheless reflecting Congress's policy judgment as to appropriate considerations and the guideline range.

### A. The sentencing guidelines applicable here are unique in that they are not the product of the Sentencing Commission's institutional expertise.

The Ninth Circuit has observed that the child pornography guidelines "are, to a large extent, not the result of the Commission's 'exercise of its characteristic institutional role,' which requires that it base its determinations on 'empirical data and national experience,' but of frequent mandatory minimum legislation and specific congressional directives to the Commission to amend the Guidelines." *United States v. Henderson*, 649 F.3d 955, 962-63 (9th Cir. 2011) (quoting *Kimbrough v. United States*, 552 U.S.85, 109 (2007)).

> Most of the revisions were Congressionally-mandated and not the result of an empirical study. As the Commission itself has explained, 'The frequent mandatory minimum legislation and specific directives to the Commission to amend the [G]uidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the

influences of the Commission from those of Congress.'

*Id.* at 962. Thus, district courts may vary downward from the Guidelines in these cases based upon policy disagreement rather than solely "based on an individualized determination that they yield an excessive sentence in a particular case." *Id.* at 964.

Although *Henderson* specifically addressed the history of section 2G2.2, the history of Guidelines section 2G2.1 reveals that it is uniquely political rather than driven by the Sentencing Commission's data-driven research or expertise. For example, consider the base offense level. Originally, in 1987, production offenses were subject to a base offense level of 25 and only one specific offense characteristic existed (for victims under 12 years old). U.S.S.G § 2G2.1 (1987). Since then, it has increased twice.

First, in 1996, Amendment 537 increased the base offense level from 25 to 27. The change was militated exclusively and specifically by section 2 of the Sex Crimes Against Children Prevention Act of 1995, Pub. L. 104-71, 109 Stat. 774, which stated "The United States Sentencing Commission shall amend the sentencing guidelines to . . . increase the base offense level . . . by at least 2 levels."

Next in 2004, the Commission increased it from 27 to 32, explaining that it was done because "the PROTECT Act increased the mandatory minimum term of imprisonment from 10 to 15 years for offenses related to the production of child pornography under 18 U.S.C. § 2251" and the Commission sought to ensure "that the 15-year mandatory minimum . . . will be met . . . in almost every case." U.S.S.C. Amendment 664 (2004).

Thus, both changes to the base offense level for 2G2.1, which more than double the guidelines here 78-97 months to 168-210 months, had nothing to with the Commission's ordinarily careful research and unique insights.[8]

---

[8] The Commission's expertise militated *against* these increases. In fact, the Commission objected to the increased penalties. *United States v. Henderson*, 649 F.3d 955, 960 (9th Cir. 2011).

*DEFENDANT'S SENTENCING MEMORANDUM*

Another notable guideline increase derives from the use of computers. Both sides agree that Mr. Dasko used a computer and that the offense characteristic in 2G2.2(b)(6) applies here.[9] Once again, that enhancement derived directly from Congressional mandate. *Henderson*, 649 F.3d at 961. However, the Commission was critical of this enhancement. *Id.* Thus, since the enhancement does "not exemplify the Commission's exercise of its characteristic institutional role" the recommended guideline range may not "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). With special reference to the computer enhancement, the Second Circuit has recognized that § 2G2.2 is "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *United States v. Dorvee*, 616 F.3d 174, 186, 188 (2d Cir. 2010) (stating that child pornography guideline "is fundamentally different from most and . . . unless applied with great care, can lead to unreasonable sentences").

As Judge Berzon of the Ninth Circuit has ably explained in terms equally applicable to 2G2.1:

> unjust and sometimes bizarre results will follow if § 2G2.2 is applied by district courts without a special awareness of the Guideline's anomalous history, chronicled in the court's opinion and elsewhere. *See Troy Stabenow, Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines*, Jan. 1 2009 (unpublished comment).
>
> [. . .] an unduly deferential application of § 2G2.2 will lead to the vast majority of offenders being sentenced to near the maximum statutory term. [. . .] Such a concentration of nearly all offenders near the

---

[9] In their sentencing filings, it appears the Government proposes a computer enhancement under 2G2.1. That is not what was proposed in the plea agreement or presentence report, both of which cross-reference 2G2.2's computer enhancement. Under either provision it is two levels, but the defense understood the agreement to be confined to 2G2.2(b)(6), which has been roundly criticized and more frequently analyzed in academic literature and caselaw.

*DEFENDANT'S SENTENCING MEMORANDUM*

statutory maximum stands in significant tension with a sentencing judge's duties 'to consider every convicted person as an individual,' *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotation omitted), and to impose a sentence no 'greater than necessary' to achieve § 3553(a)'s objectives. *See* 18 U.S.C. § 3553(a); *see also* Gall, 552 U.S. at 55, 128 S.Ct. 586.

*Henderson*, 649 F.3d 955, 964–65 (9th Cir. 2011) (Berzon, J. concurring).[10] For the foregoing reasons, guidelines section 2G2.1 is entitled to less weight than the guideline range applicable in other types of cases and the Court should vary downward to a range nearer the heartland of Mr. Dasko's underlying crime rather than near the statutory maximum.

**B. The heartland of production cases to which 2G2.1 historically applied involved hands-on crimes.**

Even if the Court adopts and strictly applies 2G2.1 without any policy-based variance, it should vary downward because Mr. Dasko's offense is not in the heartland of child pornography production crimes. "[A] district court's decision to

---

[10] Nor is Judge Berzon alone in her criticism. A review of testimony by district judges before the Sentencing Commission in a series of public hearings commemorating the twenty-fifth anniversary of the Sentencing Reform Act illustrates the view that the child pornography guidelines often do not reflect the seriousness of the offense.

Chief District Judge Susan Oki Mollway (District of Hawaii), for instance, testified: "I have been troubled by Guideline 2G2.2, as applied in certain child pornography cases. More than once, I have viewed the guidelines as suggesting a sentence that is disproportionately high for the offense conduct."

District Judge Richard J. Arcara (Western District of New York) stated: "It also seems to be the case that numerous enhancements apply to every child pornography offender...Once all of these enhancements are applied, a first-time offender is often facing the statutory maximum."

Finally, Chief District Judge Audrey B. Collin (Central District of California) asserted: "We see so many of these cases lately, and while we do not necessarily all agree on how [child pornography cases] should be handled, everyone does agree that the Guidelines applicable to these cases are not well-designed.

*DEFENDANT'S SENTENCING MEMORANDUM*

vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case 'outside the 'heartland' to which the Commission intends individual Guidelines to apply.'" *United States v. Henderson*, 649 F.3d 955, 959 (9th Cir. 2011). Mr. Dasko does not dispute that he was involved in production of sexually explicit imagery of minors. However, the Guidelines are unreasonably high because the Sentencing Commission and Congress adopted and amended section 2G2.1 with hands on, in-person production in mind.

Examining all defendants sentenced in Fiscal Year 2022, the United States Sentencing Commission found that 69.9 percent of defendants sentenced under the production guidelines (2G2.1) committed a sex act or aggravates sexual abuse involving force, threats, or unconsciousness.[11] Consistent with the widespread application of those enhancements in production cases, a separate report by the Sentencing Commission concluded more than 4 out of 5 production cases involved an offender having sexual contact with a minor.[12] No one has suggested in-person production here, which from the outset places Mr. Dasko outside the mine-run of cases sentenced under 2G2.1.



**7** The vast majority of fiscal year 2019 child pornography production offenders (80.9%) were sentenced for an offense that involved sexual contact of a minor.

Excerpt. The Commission's Use of a Hand Icon Is Illustrative of the Animating Concern.

In contrast, although remote "catfishing" undoubtedly qualifies as production

---

[11] Use of Guidelines and Specific Offense Characteristics Offender Based, Fiscal Year 2022, at 97, available at www.ussc.gov/ (the pertinent page of data is included here at Appendix A).

[12] Federal Sentencing of Child Pornography Production Offenses, United States Sentencing Commission (October 2021), at 12, available at www.ussc.gov/.

*DEFENDANT'S SENTENCING MEMORANDUM*

covered by guideline section 2G2.1, it appears to be comparatively rare.[13] This is best illustrated by the infrequency with which 2G2.1(b)(6)(B)(ii) is applied in production cases. That enhancement covers the use of a computer to "solicit participation by or with a minor" to produce explicit material. U.S.S.G. § 2G2.1(b)(6)(B)(ii). Thus, the enhancement would apply to catfishing in addition to a broad swath of other, likely more frequent, direct contact with victims over the internet. However, in fiscal year 2022, the enhancement for solicitation over a computer applied in fewer than 16% of production cases.[14] Accordingly, even before considering Mr. Dasko's lesser role in Mr. Strange's and Mr. Wolf's enterprise, catfishing generally appears to be outside the mine-run of cases.[15]

Furthermore, it makes sense that the production Guidelines would have been aimed primarily at punishing in-person, recorded, sexual encounters with minors by defendants. The guidelines were first adopted in 1987, when virtually no sexually explicit material involving minors was produced remotely. Teens did not carry high-quality cameras in their pockets and the only effective means of communicating was over audible land-line telephones or in-person. "Due to technological advancements and the changing nature of production offenses," even as late as 2010, fewer than 15% of offenders met their victims online compared to

---

[13] Despite affirmative searches and review of sentencing documents and decisions in dozens if not over 100 recent, similar cases, counsel has only identified a handful predicated upon catfishing without an accompanying hands-on offense. Bourassa Decl. ¶ 10.

[14] Supra note 11.

[15] An examination of these two types of enhancements further illustrates the sound policy bases for questioning application of 2G2.1 more broadly. One enhancement (under 2G2.1(b)(2)(A)) adds 2 offense levels when there is in-person penetrative sex with a minor for purposes of producing sexually explicit material of minors. The other (under 2G2.1(b)(6)(B)(ii)) adds 2 offense levels when someone asks a minor via text message for a picture of their genitals. These are plainly dissimilar activities with widely divergent harms and concerns, but, owing to its bizarre patchwork political history, section 2G2.1 treats these actions the same way.

*DEFENDANT'S SENTENCING MEMORANDUM*

35% today.[16] Thus, the applicable guidelines (adopted in 1987) and controlling Congressional amendments that dramatically increased production guidelines (in 1996 and 2004 respectively) were promulgated *before* these offenses predominantly occurred, or at least began, over the internet.

Ultimately, although both are criminal and serious, production of sexually explicit material involving minors through in-person, recorded, sexual contact with a minor is not the same as internet-based catfishing. Historically, and continuing through to now, Guideline section 2G2.1 has been applied primarily to the former. Thus, Mr. Dasko's offense conduct is outside the heartland of offenses covered by section 2G2.1 and the Court should vary downward to accommodate the meaningful differences. *Henderson*, 649 F.3d at 959.

### C. Strict application of 2G2.1 without variance would punish Mr. Dasko's crime more harshly than serious violence and rape offenses.

Relatedly, section 2G2.1 "recommends longer sentences . . . than the applicable Guidelines recommend for those who actually engage in sexual conduct with minors. *See Dorvee,* 616 F.3d at 187. Such a result is particularly illogical." *United States v. Henderson*, 649 F.3d 955, 965 (9th Cir. 2011) (Berzon, J. concurring).[17] These perverse consequences of the child pornography guidelines have been repeatedly and persuasively examined elsewhere. *See e.g., Deconstructing the Myth of Careful Study: A Primer on the Flawed Progressions of the Child Pornography Guidelines*, (Stabenow 2008) ("the hypothetical

---

[16] Federal Sentencing of Child Pornography Production Offenses, United States Sentencing Commission (October 2021), at 11, available at www.ussc.gov/.

[17] Although *Henderson* is not a production case, the same animating concern holds here. *See, e.g.*, U.S.S.G. § 2A3.1 (resulting in offense level 32 for criminal sexual abuse of a minor in the age range of the victims here); 2A3.2 (resulting offense level 24 for sexual abuse of a minor under 16 when enticed over the internet by false representations about defendant's identity); 2G1.3 (similar for inducing commercial sex acts by minors).

*DEFENDANT'S SENTENCING MEMORANDUM*

defendant convicted of child pornography faces a Guideline range 194% higher than a man who planned a month's long campaign to cross state boundaries and engage in repeated sex with a twelve-year-old").

Here, Mr. Dasko's adjusted offense level (before the reduction for acceptance of responsibility) is 38. A few illustrative hypotheticals and accompanying guidelines illustrate how out-of-step Mr. Dasko's starting offense level of 38 is in relation to other crimes:

- A man suddenly loses his temper and kills a child with a knife. The second-degree murderer has the same offense level as Mr. Dasko.

  | §2A1.2 - SECOND DEGREE MURDER |
  | --- |
  | (a) Base Offense Level: 38 |

- A man plans and attempts to kill a child in cold blood with a knife, but the child survives with permanent, life-threatening injuries. This man is subject to a lower offense level than Mr. Dasko (37).

  | §2A2.1 - ASSAULT WITH INTENT TO COMMIT MURDER; ATTEMPTED MURDER |
  | --- |
  | (a) Base Offense Level: |
  |    (1) 33, if the object of the offense would have constituted first degree murder; or |
  |    (2) 27, otherwise. |
  | (b) Specific Offense Characteristics |
  |    (1) If (A) the victim sustained permanent or life-threatening bodily injury, increase by 4 levels; |

- A man kidnaps a child at gunpoint for more than one month, resulting in

  | §2A4.1 - KIDNAPPING, ABDUCTION, UNLAWFUL RESTRAINT |
  | --- |
  | (a) Base Offense Level: 32 |
  | (b) Specific Offense Characteristics |
  |    (1) If a ransom demand or a demand upon government was made, increase by 6 levels. |
  |    (2) (A) If the victim sustained permanent or life-threatening bodily injury, increase by 4 levels; (B) if the victim sustained serious bodily injury, increase by 2 levels; or (C) if the degree of injury is between that specified in subdivisions (A) and (B), increase by 3 levels. |
  |    (3) If a dangerous weapon was used, increase by 2 levels. |
  |    (4) (A) If the victim was not released before thirty days had elapsed, increase by 2 levels. |

*DEFENDANT'S SENTENCING MEMORANDUM*

permanent bodily injury. This man's adjusted offense level is also 38.

- A man buys or sells children for use in the production of child pornography would be subject to the same guideline range as Mr. Dasko.

§2G2.3 - SELLING OR BUYING OF CHILDREN

(a) Base Offense Level: 38

Mr. Dasko's crime is immensely serious, but it is not on the same order as murdering a child, permanently injuring a child during an attempted murder, kidnapping a child, or buying children for use in child pornography. The Government's request for a sentence at the high end of the 2G2.1 guideline range (210 months) should carry less weight when the Court considers that the median sentence for federal, second-degree murder is 216 months.[18] The median is 120 months in assault with intent to commit murder cases,[19] 139 months in kidnapping cases,[20] and 120 months in sentences for crimes involving commercial sex acts with minors.[21]

As illustrated here, section 2G2.1 is out-of-step with the overall scheme of the Guidelines, owing to its unique history and the Commission's lack of supporting empirical research or control over its development. Mr. Dasko's crime was serious, but it was not murder, kidnapping, or prostitution of a minor. The Court should vary downward accordingly.

---

[18] The Sentencing Commission's Data indicates the second-degree murder guideline has been applied 246 times in the last 5 years, with a median sentencing outcome of 216 months. Bourassa Decl. ¶ 11.

[19] *Id.* (examining the 707 times the applicable guideline was used in the last 5 years).

[20] *Id.* (examining the 468 times the applicable guideline was used in the last 5 years).

[21] *Id.* (examining the 1,901 times the applicable guideline was used in the last 5 years).

*DEFENDANT'S SENTENCING MEMORANDUM*

**D. Mr. Dasko proposes a sensible compromise downward variance that respects Congressional mandates about the appropriate sentencing of production cases and avoiding an unwarranted sentencing disparity.**

The Court need not guess at an appropriate variance without any relevant benchmarks. Ultimately, a six-level variance under *Kimbrough* or in light of the foregoing concerns about section 2G2.1, would align with the purpose of the Guidelines, respect Congressional insights into the appropriate sentence, and avoid an unwarranted sentencing disparity. If applied, the resulting offense level of 30 carries a guideline range of 87-108 months.

In 1996, the United States Sentencing Commission reported to Congress that the average sentence in cases involving the production of sexually exploitative material under 2G2.1 was 79 months.[22] At the time, the overwhelming majority of production defendants were sentenced *within* the guideline range. *Id.* at 6. Congress instructed the Commission to increase offense levels by two, which the Commission informed Congress would entail an increase in the average sentence of "about 16 months longer then under current practice." *Id.* at 8. Thus, Congress's implied conclusions (informed by the Commission's data) were that an average sentence of 95 months was appropriate in production cases, that 79 months was too low on average, and that an increase in the guidelines was appropriate at that specified level.[23]

In this case, Mr. Dasko proposes that the Court consider applying 2G2.1 approximately as it existed in practice from 1996 through 2004. A six-level

---

[22] Report to the Congress: Sex Offenses Against Children Findings and Recommendations Regarding Federal Penalties (as directed in the Sex Crimes Against Children Prevention Act of 1995, Section 6, Public Law 104-71), United States Sentencing Commission (June 1996) at 4, available at www.ussc.gov (the informative page of data has been extracted and included at page 2 of Appendix A).

[23] Notably, Mr. Dasko's proposed sentence of 84 months falls within this range contemplated by the Commission and Congress at the time.

*Kimbrough* variance would result in a Guideline range of 87-108, approximately what Congress all-but expressly intended.

The Commission's subsequent increase in the base offense level by 5 (from 27 to 32) alongside broadly applicable enhancements, deviated from the Commission's ordinary practice, informed by research and study, in cases that involve mandatory minimums. Specifically, the Commission sought to ensure "that the [newly adopted] 15-year mandatory minimum [for production convictions] . . . will be met . . . in almost every case." U.S.S.C. Amendment 664 (2004). But the uniquely punitive five-level increase in 2004 does not comport with the Commission's customary practice in relation to mandatory minimum sentencing schemes. It is therefore entitled to little weight.

Elsewhere, the Commission routinely crafts the guidelines to fall *below* the mandatory minimum sentence because it recognizes that charge bargaining and the relevant conduct rules under 1B1.3 frequently cause guideline sections to apply with little regard to the specific offense of conviction (and mandatory minimum sentences) and that such discretionary decisions align with the Commission's goals.

For example, consider the drug guidelines. 50 grams of methamphetamine may carry a 10-year minimum sentence (21 U.S.C. § 960(b)(1)(H)), but guideline section 2D1.1 results in a guideline range of 70-87 months, after acceptance of responsibility, where the crime involved only 50 grams of methamphetamine. As the Court is aware, considering role and other adjustments, the drug guidelines for 50 grams of methamphetamine bear almost no resemblance to the 10-year minimum sentence contemplated by Congress. Thus, the Commission did not attempt to marry the drug guidelines (the most common mandatory minimum offenses) to their attendant mandatory minimum sentences. There is no evidence that Congress has interpreted these guidelines as an afront to its mandatory-minimum sentences regime or attendant policy judgments.

The same holds for certain child pornography offenses. For example, the

*DEFENDANT'S SENTENCING MEMORANDUM*

Guidelines for sale of a minor to produce sexually explicit material call for a sentence in the range of 168-210 months (the same applicable to Mr. Dasko) after acceptance of responsibility. However, the mandatory minimum sentence for such a crime is 30 years. 18 U.S.C. § 2251A(a). The disparity impliedly acknowledges that the Guideline section may apply to defendants who, for sound reasons of discretion, are subject to the Guideline section without having been convicted of the statute carrying a mandatory minimum.

The Commission could have, and should have, adopted the same balanced approach under 2G2.1. As the Commission has acknowledged in studying sentences under 2G2.2, about 10% of defendants sentenced under 2G2.2 actually engaged in production of explicit materials or similar behaviors covered by 2G2.1.[24] However, the bargaining over statute of conviction (and typically the controlling guideline section) reflects "to some degree, the seriousness of offender conduct."[25] The Commission found the underlying production factors "do not strongly equate with more serious [sentences]."[26] Thus, there is evidence that the parties and judges are able to manage settlements and sentencing for a wide variety of defendants under 2G2.2 in a way that reflects the seriousness of the defendants' conduct.

But the dramatic and unique increase in 2004 of the base of level under 2G2.1 prevents the same measured comparative outcomes in the mine-run of production cases. Instead, under 2G2.1, the guideline range exceeds 15 years "in almost every case." U.S.S.C. Amendment 664 (2004). That effect, predicated on nothing but an arbitrary decision by the Commission, unnecessarily narrows the range of prospective outcomes to sentences approaching either life or the statutory

---

[24] *Federal Sentencing of Child Pornography Non-Production Offenses*, United States Sentencing Commission (June 2021) at 52, available at www.ussc.gov.

[25] *Id.*

[26] *Id.*

*DEFENDANT'S SENTENCING MEMORANDUM*

maximums (here the range approaches the statutory maximum for Mr. Dasko's conviction even though he is outside the heartland of production cases).

The best alternative, which the Court should embrace here, is a downward variance of six levels to adjust for the ill-conceived 2004 amendment and subsequent amendments. The resulting range would align with historical practice (average sentences were 79 months prior to its adoption), avoid wholly discounting Congress's desire for sentences higher than historical practice in production cases (Congress required a 2-level increase in 1994), and anchor the Court's sentence to a range consistent with Mr. Dasko's conduct (placing him between the mine-run of possession/distribution cases and the heartland of hands-on production cases) thereby avoiding an unwarranted sentencing disparity. [27]

---

[27] As indicated in Mr. Dasko's sentencing chart, he submits there is good cause for three additional departures or variances that are not discussed at length herein. Among them are:

(1) A two-level variance for expeditious resolution. Mr. Dasko resolved this case soon after receiving the principal discovery and without litigating substantive motions. As the Ninth Circuit has long held, such conservation of resources exceeds that required for the baseline reduction for acceptance of responsibility. *United States v. Kimple, 27 F.3d 1409, 1414–15 (9th Cir. 1994).* Accordingly, even in child pornography cases, the Government routinely recommends such a downward departure. *See, e.g.*, *U.S. v. Pushkin*, 22-cr-414-DMS (S.D. CA.) dkt no 41 (Govt Sentencing Summary Chart); *U.S. v. Moses*, 22-cr-920-BAS (S.D. CA) dkt no 40 (same). There is no principled reason an analogous departure or variance would not apply to Mr. Dasko.

(2) A two-level variance because Mr. Dasko's production conduct was indirect. Guidelines section 2X1.1(b) contemplates a three-level downward variance in conspiracy, attempt, and solicitation cases unless the substantive offense is completed by someone. Since the substantive offense and production was completed here, 2X1.1(b) does not apply, per se. However, 2X1.1(b) reflects the Commission's acknowledgment that *Pinkerton* and secondary liability for the crimes of others with whom you agree, solicit, or attempt, is not the same as committing the substantive acts yourself. The latter is worse. Accordingly, Mr. Dasko requests a partial application of 2X1.1(b) consistent with his indirect role in the production.

(3) A two-level variance based upon Mr. Dasko's mental health and post-offense rehabilitation. The factual background supporting this variance is already set forth above.

*DEFENDANT'S SENTENCING MEMORANDUM*

### III.   Mr. Dasko Poses a Low-Risk of Reoffending and a Guideline Sentence Would Produce a Sentencing Disparity Rather than Avoid One.

Setting aside widely observed criticisms of guidelines section 2G2.1's application and importance here, other 3553(a) factors strongly militate in favor of a downward departure or variance from the Guidelines. Compelling research indicates that Mr. Dasko poses a low risk of reoffending. Furthermore, by multiple measures, strict adherence to the Guidelines without a downward variance would result in an unwarranted sentencing disparity.

### A. Mr. Dasko poses a low risk of reoffending.

It is commonplace to hear discussion of sexual offenders and the perceived heightened risk of recidivism they pose. The Government impliedly invokes such beliefs when it describes Mr. Dasko as "a predator" with "a need to fulfill his sexual desires." Govt Sentencing Memorandum. But such assertions have no basis in fact beyond conjecture. On the contrary, the best available research on sex offenders involved with sexually explicit imagery of minors is that they are comparatively low risk of reoffending. The Court need not guess in determining its sentence and should base its decision on Mr. Dasko's behavior, research, and data.

As an initial matter, the Government invoked the same concerns in seeking to hold Mr. Dasko in pretrial detention. Then, as set forth above, Mr. Dasko pointed to compelling research showing he did not pose the risks the Government claimed. One year later, the Government's oft-repeated fears have not been borne out by the evidence. There is little reason to believe now would be different.

As an initial matter, there is compelling evidence that defendants who participate primarily in their crime over the internet (like Mr. Dasko) are fantasy driven offenders with criminogenic factors that distinguish them from contact-driven offenders who engage in online activities in order to arrange real-world

*DEFENDANT'S SENTENCING MEMORANDUM*

meetings.[28] The former (like Mr. Dasko) find online sexual chat or exchange of pornographic images gratifying in and of itself, without a desire for physical contact with victims.[29] Thus, behaviors like "requesting sexually explicit images from the minor, or suggesting mutual masturbation via webcam" are distinguishable from different offenders' attempts to arrange offline meetings.[30] Other, related research has confirmed these factors militate against concern about offenders like Mr. Dasko.

For example, in 2011, academic researchers performed a meta-analysis of available research (approximately 24 separate, previously published studies) with a total sample of 2,630 offenders convicted of child pornography offenses with follow up between 1.5 and 6 years later. What they found analyzing the data is that fewer than 1 in 20 online offenders committed a new sexual offense of some kind, mostly new child pornography offenses.[31] Ultimately, these recidivism rates are lower than those observed in recidivism studies of offline offenders and "belie the idea that all online offenders pose a high risk of committing contact offenses in the future."[32] The researchers concluded from comparing studies of offenders with different offenses and backgrounds, as well as recidivism outcomes, that "there is a distinct

---

[28] Briggs, P., Simon, W. T., & Simonsen, S. (2011). *An exploratory study of internet-initiated sexual offenses and the chat room sex offender: Has the Internet enabled a new typology of sex offender?* Sexual Abuse: A Journal of Research and Treatment, 23, 72-91. Doi: 10.1177/1079063210384275

[29] *Id.*

[30] R. Gregg Dwyer, et al. *Protecting Children Online: Using Research Based Algorithms to Prioritize Law Enforcement Internet Investigations, Technical Report* (August 2016) available at www.ojp.gov (discussing Briggs et al. supra note 28).

[31] Seto, M.C., Hanson, R.K., & Babchishin, K.M. *Contact sexual offending by men arrested for child pornography offenses*. Sexual Abuse: A Journal of Research and Treatment, 23, 124–145 (2011).

[32] Michael Seto, *Internet-Facilitated Sexual Offending*, Sex Offender Management Assessment and Planning Initiative Research Brief for U.S. Department of Justice Office of Justice Programs (July 2015) at 2-3.

*DEFENDANT'S SENTENCING MEMORANDUM*

group of online offenders whose only sexual crimes involve illegal (most often child) pornography or, less frequently, illegal solicitations of minors using the Internet."[33]

This was confirmed again in a 2019 study of nearly 600 offenders convicted of crimes relating to indecent images of children without any contact-offense. After a 13-year follow up period, only 2.7% (1 in 37) offenders committed new contact sexual offenses.[34]

Thus, whatever conjecture may exist about "predators" and their likelihood of reoffending unless permanently confined to prison, it is not supported by the evidence. On the contrary, offenders like Mr. Dasko are lower risk than most, greatly diminishing the need for specific deterrence.

**B. A Guideline sentence would result in a sentencing disparity.**

The overwhelming majority of defendants sentenced under section 2G2.1 are sentenced below the guidelines. In a 2021 report by the Sentencing Commission, it found "[l]ess than one-third (30.7%) of child pornography production offenders received a sentence within the guideline range," with the vast majority receiving a sentence below the guidelines by virtue of a departure or variance.[35] The Sentencing Commission's publicly available data confirms that adherence to this guideline section has been in decline and that the Sentencing Commission's 2021 finding was

---

[33] Supra note 31 at 136.

[34] Elliott, I. A., Mandeville-Norden, R., Rakestrow-Dickens, J., & Beech, A. R. *Reoffending rates in a U.K. community sample of individuals with convictions for indecent images of children*. Law and Human Behavior, 43(4), 369–382 (2019).

[35] Federal Sentencing of Child Pornography Production Offenses, United States Sentencing Commission (October 2021), at 28, available at www.ussc.gov/.

*DEFENDANT'S SENTENCING MEMORANDUM*

not unique to that year. It has persisted since at least 2015.[36] Since fealty to the flawed guideline section has become the exception rather than the rule, 18 U.S.C. § 3553(a)(6) requires the Court to vary or depart downward to avoid an unwarranted sentencing disparity.[37]

Although the Government baldly asserts that a high-end sentence is appropriate, all available data is to the contrary. Even in those few cases where judges adhere to the range resulting from application of 2G2.1, as illustrated by the accompanying chart, more defendants are sentenced at the low end of the range than in the entire top half.[38] Only 5.8% of



---

[36] Bourassa Declaration ¶ 11 (departure and variance frequency in 3,963 cases where section 2G2.1 was applied).

[37] Courts' downward departures from the draconian guidelines under section 2G2.1 are somewhat unique. Overall, judges nationwide adhere to the guideline range more often than not. Considering all offenders in the Commission's dataset (531,786 cases), judges apply sentences within the guidelines (including after fast-track and 5K departures) 67.9% of the time (361,260 cases). Bourassa Decl. ¶ 11. Thus, judges use their discretion to sentence below the guidelines more than twice as often in cases where 2G2.1 is the applicable guideline section.

[38] Bourasa Decl. ¶¶ 6 & 11.

*DEFENDANT'S SENTENCING MEMORANDUM*

production defendants are sentenced at the high-end of their guidelines.[39] Accordingly, to justify a high-end sentence, the Government would have to demonstrate that Mr. Dasko was among the worst production defendants.

However, Mr. Dasko compares favorably to other production defendants by most objective measures. He has no criminal history, whereas more than 28% of production defendants are Category II or higher.[40] Similarly, the victims here were older than most common in production offenses:[41]



Figure 11. Age of Youngest Victim in Child Pornography Production Offenses
*Fiscal Year 2019*

Of course, cases involving younger victims tend to result in higher sentences – justifying sentences within the guidelines are at the top of the guidelines.[42]

Thus, before even considering that the overwhelming majority commit hands-on crimes, Mr. Dasko is among the least-culpable production defendants. Since most production defendants are more culpable and receive sentences below

---

[39] Bourassa Decl. ¶ 11. (data demonstrates that in 2022 35.5% of defendants were sentenced within the guideline range and 16.4% were sentenced at the high-end. 35.5% multiplied by 16.4% is 5.8%, the percentage of defendants overall who are sentenced at the high-end).

[40] Bourassa Decl. ¶ 11.

[41] Federal Sentencing of Child Pornography Production Offenses, United States Sentencing Commission (October 2021), available at www.ussc.gov/.

[42] Whereas it only increases the offense level by two, victims under twelve are associated with sentences approximately 1/3 higher. Federal Sentencing of Child Pornography Production Offenses, United States Sentencing Commission (October 2021), at 52, available at www.ussc.gov/.

*DEFENDANT'S SENTENCING MEMORANDUM*

the guideline range, sentencing Mr. Dasko within or at the high-end would result in an unwarranted sentencing disparity.

### C. Mr. Dasko's work as a teacher does not make him unique. An 84-month sentence is normal in such cases.

Certainly, Mr. Dasko's employment as a teacher and hockey coach adds a layer of additional concern and abuse of trust to the case, even if the Guidelines don't provide for a specific enhancement. However, Mr. Dasko's requested sentence here (84 months) is informed by counsel's detailed, nationwide effort to research conduct and sentences in cases involving teachers or coaches.

Counsel and a paralegal employed by McKenzie Scott PC sought to identify a broad and representative sample of child pornography cases involving teachers. Since such cases ordinarily involve local new coverage, counsel performed web searches for new alerts stemming from federal child pornography offenses and teachers between 2013 and 2020.[43] Counsel then obtained sentencing filings, plea agreements, and judgments from the attendant federal court dockets online and reviewed them, constructing a dataset in the process.[44] Counsel specifically sought insight into whether these cases involving teachers also involved production of explicit material and whether the defendant was convicted of a hands-on offense. The results follow.

Rather than necessitating a higher sentence, Mr. Dasko compares favorably

---

[43] Bourassa Decl. ¶¶ 12-13. The search each year was not exhaustive or intended to include every case, but rather sought a representative sample across time. Counsel *did not* cherry-pick cases or include or exclude cases from the sample based upon outcomes – in fact, a paralegal identified the cases and pulled sentencing filings without regard to outcome. Counsel stopped at 2020 because the effort proved time consuming. Counsel is unaware of any reason sentencing practices would have changed thereafter other than the obvious impacts of COVID-19, which likely renders more recent cases less-representative.

[44] Counsel's notes and the dataset is available in Appendix B and includes a variety of quotes from filings, where available. Bourassa Decl. ¶¶ 12-13.

*DEFENDANT'S SENTENCING MEMORANDUM*

to most other teachers involved in production of child pornography in the random sample, even those who received lower sentences than sought here. *See, e.g., U.S. v. Rajkumar,* 14-cr-00150-RNC (D. CT) (47-month sentence for teacher at residential high school who sexually exploited multiple students, including coercing production of images and had penetrative sex with a student while at school); *U.S. v. Snyder,* 15-cr-00083-TJM (N.D.N.Y.) (70-month sentence under guideline range of 188-235 months for substitute teacher with enormous collection, including videos and pictures he personally made abroad); *U.S. v. Cruz*, 15-cr-00338-PKC (S.D.N.Y.) (84-month sentence for 31-year-old teacher and debate coach who personally          solicited          then          paid          boys          he knew needed money" for pictures of their genitalia); *U.S. v. Schock*, 14-cr-00196-CMH (E.D. VA) (120-month mandatory minimum sentence for elementary school teacher personally soliciting sexually explicit mutual-masturbation videos from young girls and who tried to convince at least one to meet him for penetrative sex); *U.S. v. McCormack,* 17-cr-425-KOB (N.D. AL) (120-month sentence for teacher who was <u>catfishing</u> minors into sharing explicit materials online <u>but also</u> sexually touched the genitals of kindergarten student who says she told him to stop and that he did it "every day"); *U.S. v. Peeler*, 16-cr-40035-TSH (D.MA) (138-month sentence for 54-year-old math teacher who solicited hundreds of live sex acts, including penetrative sex between prepubescent minors and adults as well as animal); *U.S. v. Yockel,* 17-cr-06175-EAW (W.D.N.Y.) (156-month sentence for kindergarten teacher who collected exploitation material and admitted placing 7-year-old in contact with his penis over clothing, manipulating clothing to view private parts, and admitted he would have touched more children if there weren't others in the room); *U.S. v. Ranzenberger*, 16-cr-20389-TLL (E.D. MI) (168-month sentence for teacher who physically sexually abused a minor under 12 three times a week for 7 years, including sex between the minor's legs and ejaculating on the minor). Counsel understands that such comparisons *feel* anecdotal or cherry-picked

even though they are representative.

The effort at generating a random sample of sentences imposed upon teachers tells a similar story, placing Mr. Dasko in the less-culpable group of similar offenders and suggesting an 84-month sentence is fair and consistent with similar cases. Of the 17 cases confirmed to involve production of explicit materials by teachers, most involved hands-on crimes – confirming such crimes are the "heartland" of guideline section 2G2.1 and that the Guideline may not fairly measure the seriousness of the offense here.[45] **Excluding hands-on offenses, the median sentence given to the teachers convicted of child pornography offenses was 84 months**.[46] Among the teachers specifically convicted of producing sexually explicit materials, but who did not commit a hands on offense, none received sentences as high as proposed by Probation and the Government and the average sentence imposed in those cases (134 months) was well below the low end of the guidelines here. Overwhelmingly, teachers, like the broader population of child sex offenders received sentences below the guideline range.

Thus, whereas defendant's request for an 84-month sentence is entirely consistent with those handed down in similar cases, the Government's recommendation is entirely out-of-step.

## IV.    Conclusion

Mr. Dasko will not qualify for First Step Act credits that would otherwise reduce his sentence. Unlike other defendants, he will serve virtually all of the Court's sentence. Under the defense proposal he would be released

---

[45] Nine explicitly discussed hands on offenses and two did not have sentencing filings available, but the sentencing outcomes (270 months and 504 months) as well as government recommendations (240 months and 120 *years*) were suggestive of hands-on offenses. *See* Appendix B.

[46] Bourassa Decl. ¶ 13, Appendix B.

*DEFENDANT'S SENTENCING MEMORANDUM*

in or around 2030. Hopefully his mother and stepfather will still be alive to lend him support in his continuing rehabilitation. They will not survive to 2040. He will then embark upon 15 years of supervision by Probation. His sentence would not end in 2030, or even 2045. He faces a lifetime of sex offender registration, stigma, treatment, and hardship for the serious crimes he committed.

For the foregoing reasons, an 84-month sentence adequately serves the objectives of 3553(a). It is a serious and significant sentence for a serious crime and it is consistent with those in similar cases for similar defendants.

Dated: September 12, 2023          */s/ Marcus S. Bourassa*
                                   Marcus S. Bourassa
                                   McKenzie Scott PC
                                   Attorneys for Daniel Dasko

*DEFENDANT'S SENTENCING MEMORANDUM*