1              UNITED STATES DISTRICT COURT

2         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3           BEFORE THE HONORABLE LINDA LOPEZ
                 DISTRICT JUDGE PRESIDING

4    _____

5    UNITED STATES OF AMERICA,      )   22-CR-1715-LL
                                    )
6                      PLAINTIFF,   )   SENTENCING HEARING
                                    )
7              V.                   )
                                    )
8    DANIEL ZACHARY DASKO,          )
                                    )
9                      DEFENDANT.   )
                                    )
10   _____

11           REPORTER'S TRANSCRIPT OF PROCEEDINGS

12            TUESDAY; SEPTEMBER 19, 2023

13                 PAGES 1 - 51

14   APPEARANCES:

15   FOR THE PLAINTIFF:      UNITED STATES ATTORNEY'S OFFICE
16                           BY:  *AMANDA GRIFFITH, ESQ.*
                                  *ANDREW SHERWOOD, ESQ.*
17                           880 FRONT STREET, ROOM 6293
                             SAN DIEGO, CALIFORNIA  92101
18
     FOR THE DEFENDANT:      MCKENZIE SCOTT PC
19                           BY:  *MARCUS BOURASSA, ESQ.*
                                  *MCKENZIE SCOTT, ESQ.*
20                           1350 COLUMBIA ST, UNIT 600
                             SAN DIEGO, CALIFORNIA  92101
21

22

23
     COURT REPORTER:         VANESSA EVANS, CSR, RPR, FCRR
24                           UNITED STATES DISTRICT COURT
                             SOUTHERN DISTRICT OF CALIFORNIA
25                           333 WEST BROADWAY, SUITE 420
                             SAN DIEGO, CALIFORNIA 92101

```
 1                    P R O C E E D I N G S

 2                        -- OOO --

 3          THE CLERK:  CALLING MATTER NO. 1 FROM THE CALENDAR,

 4   22-CR-1715, UNITED STATES OF AMERICA VS. DANIEL ZACHARY DASKO,

 5   ON CALENDAR FOR A SENTENCE WITH PSR.

 6          MS. GRIFFITH:  GOOD MORNING, YOUR HONOR.  AMANDA

 7   GRIFFITH AND ANDREW SHERWOOD APPEARING ON BEHALF OF THE UNITED

 8   STATES.

 9          THE COURT:  GOOD MORNING.

10          MR. BOURASSA:  GOOD MORNING, YOUR HONOR.  MARCUS

11   BOARASSA AND MCKENZIE SCOTT HERE FOR MR. DASKO, WHO IS SEATED

12   TO MY RIGHT OUT OF CUSTODY.

13          THE COURT:  GOOD MORNING, SIR.

14          WE ARE HERE THIS MORNING FOR YOUR SENTENCING, SIR, AND

15   THAT IS ON THE CHARGE OF VIOLATION OF TITLE 18, UNITED STATES

16   CODE, SECTION 2252(A)(2) AND CRIMINAL FORFEITURE.

17          COUNSEL, ARE YOU READY TO PROCEED?

18          MR. BOURASSA:  YES, YOUR HONOR.

19          THE COURT:  AND DID YOU REVIEW THE PRESENTENCE REPORT

20   WITH YOUR CLIENT?

21          MR. BOURASSA:  YOUR HONOR, WOULD THE COURT MIND IF I

22   MAKE REMARKS SEATED?  I KEEP STANDING AND SITTING A BIT

23   AWKWARDLY.

24          THE COURT:  WHATEVER YOU ARE HAPPY WITH.  IF YOU WANT

25   TO SIT, YOU CAN SIT.  IF YOU WANT TO STAND AND HAVE YOUR CLIENT
```

1    WITH YOU AT THE PODIUM OR IF YOUR CLIENT WANTS TO REMAIN AT

2    COUNSEL TABLE, MAKE YOURSELF COMFORTABLE.

3            SAME FOR BOTH PARTIES.

4            MR. BOURASSA:  THANK YOU, YOUR HONOR.  I THINK WE ARE

5    AVOIDING THE PODIUM BECAUSE WE UNDERSTAND OTHER FOLKS MAY SPEAK

6    AND ARE TRYING TO BE RESPECTFUL.

7            I REVIEWED THE PSR WITH MY CLIENT, AND WE ARE READY TO

8    PROCEED.

9            THE COURT:  THANK YOU.  SO I WILL NOTE ON THAT END

10   THAT AN OBJECTION WAS FILED.  I DID RECEIVE THE ADDENDUM FROM

11   PROBATION, SO THAT OBJECTION AT THIS TIME IS MOOT.  I AGREE

12   WITH THE PARTIES REGARDING THAT TWO-LEVEL ENHANCEMENT.

13           SO I HAVE REVIEWED IN THIS CASE THE CHARGING DOCUMENT,

14   THE PLEA AGREEMENT, THE PRESENTENCE REPORT, THE GOVERNMENT'S

15   SENTENCING MATERIALS.  AND, SIR, I REVIEWED YOUR LAWYER'S

16   SENTENCING MATERIALS, WHICH INCLUDED MANY LETTERS OF SUPPORT

17   FROM FAMILY MEMBERS, FROM FRIENDS, FROM PEOPLE WHO KNOW YOU IN

18   THE COMMUNITY, FROM YOUR TREATMENT PROVIDER.  IT INCLUDED A

19   LETTER THAT YOU WROTE TO ME.  IT INCLUDED A LETTER YOU WROTE TO

20   THE VICTIM IN THIS CASE, AND IT INCLUDED A LOT OF HISTORICAL

21   DATA AND CHARTS AND TABLES TO DEMONSTRATE THE ONGOING CHANGES

22   TO THE PRIMARY GUIDELINE THAT APPLIES IN YOUR CASE.

23           SO I AM FAMILIAR WITH THE CHARGE AGAINST YOU, AS WELL

24   AS YOUR PERSONAL HISTORY AND CHARACTERISTICS.

25           THIS IS A DIFFICULT CASE.  SO I WILL, OUT OF THE BOX,

1    START MAKING THAT COMMENT.  THERE ARE A LOT OF PEOPLE WHO HAVE

2    BEEN HURT AND SUFFERED TREMENDOUSLY.

3            I READ OVER EVERYTHING THAT HAS BEEN SUBMITTED

4    NUMEROUS TIMES.

5            I UNDERSTAND, ON THE POSITIVE SIDE OF THINGS,

6    MR. DASKO, YOU HAVE BEEN A GREAT FAMILY MEMBER.  I COMMEND YOU

7    ON YOUR WILLINGNESS, WITHOUT HESITATION, TO SERVE AS A KIDNEY

8    DONOR FOR YOUR MOM.  I AM HAPPY -- I WAS HAPPY TO READ THAT

9    SURGERY TOOK PLACE, AND IT SEEMS THAT THINGS ARE PROGRESSING IN

10   THE WAY THAT EVERYONE HOPED THAT THEY WOULD.  YOU KNOW, THE

11   LETTER FROM YOUR BROTHER WAS VERY TOUCHING.  IT MADE IT VERY

12   OBVIOUS THAT YOU HAVE TREMENDOUS SUPPORT, AND HE'S SOMEONE WHO

13   HAS BEEN, YOU KNOW, AT YOUR SIDE YOUR WHOLE LIFE.

14           I HAVE SIBLINGS, AND WE ARE VERY CLOSE.  AND READING

15   THAT LETTER GAVE ME A SENTIMENT THAT YOU AND YOUR BROTHER --

16   DESPITE THAT HE DOESN'T LIVE HERE NOW -- SHARE THAT KIND OF A

17   RELATIONSHIP.

18           AND SO THESE ARE ALL VERY POSITIVE THINGS.  YOU KNOW,

19   FROM EVERYTHING THAT I HAVE BEFORE ME, IT SEEMS YOU HAVE BEEN

20   LIVING A LAW-ABIDING LIFE AND WERE GOING THROUGH SOME STRUGGLES

21   THAT WERE HAPPENING IN YOUR OWN MIND, AND YOU REALLY DIDN'T

22   FIND OUTLETS THAT WERE APPROPRIATE TO DEAL WITH THOSE.  SO

23   THESE ARE ALL POSITIVE THINGS.

24           THERE ARE A LOT OF VERY TROUBLING FACTS IN THIS CASE,

25   AND I WANT TO START BY POINTING OUT SOME OF THE THINGS THAT

 1    WERE REALLY TROUBLING FOR THE COURT.  IT WAS OCTOBER 15TH OF

 2    2020 WHEN THE AGENTS WENT TO YOUR HOUSE, AND THEY SPOKE TO YOU,

 3    AND YOU EXPLAINED TO THEM HOW YOU UNDERSTOOD THE GRAVITY OF

 4    THIS TYPE OF CONDUCT -- THAT IT WOULD AFFECT YOUR JOB, THAT IT

 5    WOULD AFFECT YOUR ABILITY TO COACH -- AND, YOU KNOW, THEY LEFT,

 6    AND NOTHING HAPPENED, AND YOUR ACTIVITIES JUST RAMPED UP.

 7         SO AS A SIDE NOTE WHEN YOUR LAWYER ASKS FOR A

 8    DEPARTURE OR VARIANCE FOR, YOU KNOW, MENTAL HEALTH AND

 9    POST-ARREST REHABILITATION, I'M NOT PERSUADED THAT THAT IS

10    APPROPRIATE IN THIS CASE.  BECAUSE ALTHOUGH YOU WEREN'T

11    ARRESTED UNTIL A YEAR LATER, WHEN THOSE AGENTS CAME AND YOU

12    WERE CONFRONTED, THAT WAS FLAG NO. 1 -- IF YOU HADN'T HAD ONE

13    YET, THAT WAS FLAG NO. 1 WHERE YOU SHOULD HAVE SAID:  THIS IS

14    NOT OKAY.  I AM GOING TO CONFIDE IN MY FAMILY.  I AM GOING TO

15    GET TREATMENT RIGHT NOW.  THIS IS SCARY.

16         HINDSIGHT IS 20/20.  I GET THAT.  AND I THINK EVERYONE

17    IN THIS ROOM HAS MADE A CERTAIN MISTAKE OR A COUPLE IN THEIR

18    LIVES WHERE THEY ARE LIKE, WOW, IF I HAD JUST DONE SOMETHING

19    DIFFERENTLY.  BUT THIS ONE WAS BIG.  AND IT WASN'T THAT THE

20    ADDITIONAL ACTIVITY HAPPENED ONCE MORE, AND THEN YOU WERE LIKE,

21    OKAY, AGAIN.  I'M DONE.  WHAT AM I DOING?  THIS WENT ON FOR

22    QUITE SOME TIME.

23         THE COMMUNICATIONS WITH THE GENTLEMAN -- AND I AM NOT

24    HERE TO OPINE THAT YOU STAND SIMILARLY SITUATED TO THE

25    GENTLEMAN IN PHILADELPHIA NOR THE ONE IN NEW YORK.  THOSE ARE

1    DIFFERENT CASES.  FROM THE SUMMARIES THAT I READ ABOUT THEIR

2    INVOLVEMENT, IT SEEMS TO BE FAR MORE EGREGIOUS THAN YOUR

3    INVOLVEMENT.  YOU STAND, I BELIEVE AT THIS POINT WITH THE

4    INFORMATION THAT I HAVE, IN A DIFFERENT POSTURE.

5         BUT THE MATTERS THAT WERE BEING DISCUSSED, THE THINGS

6    THAT WERE BEING SAID WERE VERY TROUBLING.

7         I KNOW THAT WE HAVE ALL AGREED THAT THAT ENHANCEMENT

8    FOR YOUR POSITION AS A TEACHER IS NOT APPROPRIATE UNDER THE

9    GUIDELINES, BUT I JUST -- I WROTE THESE NOTES.  THERE WAS ONE

10   CHAT WHERE YOU TALK ABOUT TOUCHING BOYS' BUTTS AT ASSEMBLY.

11   THAT'S PROBLEMATIC.  THAT IS USING YOUR POSITION AND YOUR JOB

12   IN A WAY THAT IS VERY DISTURBING.  THE WHOLE DIALOGUE WITH THE

13   YOUNG BOY AND THE HOCKEY PANTS WAS REALLY DISTURBING.

14        YOU KNOW, I HAVE SO MUCH SYMPATHY -- AND I KNOW THAT

15   YOUR LETTER CAPTURES IT.  SO IT'S NOT TO SAY THAT YOU DON'T

16   HAVE THAT SYMPATHY, BUT I HAVE SO MUCH SYMPATHY FOR THE

17   VICTIM'S MOM.

18        AND IS SHE HERE?

19        MS. GRIFFITH:  YES, YOUR HONOR.

20        THE COURT:  OKAY.  CAN YOU RAISE YOUR HAND?

21        IT IS JUST -- YOU WILL DEAL WITH THIS, CLEARLY, FOR

22   THE REST OF YOUR LIFE, AND I KNOW THAT.  AND I FEEL CONFIDENT

23   THAT YOU ARE REMORSEFUL AND THAT YOU REALLY ARE SORRY.

24   EVERYTHING IN FRONT OF ME, I FEEL CONFIDENT ABOUT THAT.  SO

25   YOU'RE GOING TO HAVE THINGS THAT YOU ARE GOING TO DEAL WITH.

```
 1          THEIR PAIN IS NOT ANY LESS SIGNIFICANT; IT'S PROBABLY
 2    GREATER.  HOW HER SON AND OTHER VICTIMS WHOSE LIVES WERE
 3    AFFECTED IN THIS CASE -- HOW THEY ARE GOING TO LIVE THEIR LIVES
 4    AND MOVING FORWARD IS HARD TO TELL.  I READ, AND I INTENDED TO
 5    ASK AT SENTENCING, AS I WAS READING FROM ANOTHER VICTIM -- I
 6    BELIEVE IT'S ALEX?
 7          MS. GRIFFITH:  "ANDY" I BELIEVE IS THE NAME OF THAT
 8    VICTIM.
 9          THE COURT:  ANDY.  MY APOLOGIES.  ANDY.
10          AND I WAS READING HIS DESCRIPTION OF HOW HE WAS LIVING
11    HIS LIFE YEARS AFTER HE HAD THIS HAPPEN TO HIM, AND I WAS
12    PREPARED TO DISCUSS WHETHER RESTITUTION SHOULD BE MADE
13    AVAILABLE FOR ANDY AS WELL, ONLY TO LEARN THAT ANDY IS NO
14    LONGER WITH US, RIGHT?  AND SO I DON'T KNOW THE CIRCUMSTANCES
15    AS TO HOW ANDY DIED, BUT I WOULD VENTURE TO SAY THAT IT WAS
16    PROBABLY SOMETHING RELATED TO THE TRAUMA THAT HE LIVED WITH AND
17    THE GUILT AND ALL OF THE FEELINGS THAT COME WITH THIS TYPE OF
18    ACTIVITY.  I -- MY HEART GOES OUT TO THE FAMILY MEMBERS.
19          I AM HAPPY TO -- I WAS HAPPY TO READ THAT YOU
20    IMMEDIATELY TOOK ACTION AND MADE SURE THAT THIS VICTIM GOT
21    MENTAL HEALTH TREATMENT AND FAMILY SUPPORT, AND I HOPE THAT
22    THIS CONTINUES TO HAPPEN AND THAT THIS COULD BE SOMETHING THAT
23    THIS VICTIM GROWS UP AND SAYS, YOU KNOW, I WILL BE CAUTIOUS IN
24    MY LIFE, AND I WILL MAKE DECISIONS IN MY LIFE, AND I WILL BE
25    THERE, YOU KNOW, TO HELP OTHERS IF THEY ARE IN A SIMILAR
```

1    SITUATION AND THAT IT DOESN'T DEPRIVE HIM OF THE ABILITY TO

2    LIVE A HAPPY AND FULFILLING LIFE.

3          I THINK IT'S VERY COMMENDABLE -- AND I STARTED BY

4    SAYING THIS -- THAT YOU HAVE SOUGHT REALLY INTENSIVE THERAPY

5    AND YOU ARE INVOLVED AND YOUR PROVIDER IS SO SUPPORTIVE AND

6    ENTHUSIASTIC ABOUT THE WORK THAT YOU'VE DONE.  AND SO I THINK

7    YOU'VE TAKEN ALL THE RIGHT STEPS, BUT THAT STILL LEAVES US WITH

8    A VERY DIFFICULT CASE, AND IT LEAVES ME WITH A RESPONSIBILITY

9    OF THE PUBLIC THAT I NEED TO PROTECT.

10         AND THOSE ARE MY THOUGHTS.  I AM HAPPY TO TURN IT

11   OVER.  COUNSEL, ANYTHING THAT YOU WANT TO SHARE OR ARGUE?

12         MR. BOURASSA:  THANK YOU, YOUR HONOR.  I THINK -- I

13   HOPE, AS MY ARGUMENTS IN THE SENTENCING MEMORANDUM COME ACROSS,

14   THE COURT SEES THE DIFFICULT POSITION THAT WE'RE IN BECAUSE

15   WE -- I'M OBVIOUSLY ADVOCATING FOR WHAT I THINK IS A FAIR AND

16   JUST SENTENCE, BUT WE'RE DOING THAT LARGELY BY NOT TRYING TO

17   MINIMIZE THE CONDUCT.

18         I THINK THERE ARE IMPORTANT DISTINCTIONS BETWEEN

19   MR. DASKO'S CONDUCT AND OTHER CASES THAT ARE SENTENCED NEAR

20   WHERE THE GOVERNMENT IS ASKING THE COURT TO IMPOSE A SENTENCE.

21   I WANT TO ACKNOWLEDGE THOSE, BUT WE'RE NOT THROWING OURSELVES

22   AT THE COURT ASKING FOR LENIENCY IN ALL RESPECTS OR TO MINIMIZE

23   THE CRIME.

24         AND I HAD ORIGINALLY THOUGHT WHEN WE SIGNED THIS

25   AGREEMENT -- CANDIDLY, I HAD PLANNED TO ASK FOR THE MINIMUM OF

```
1    5 YEARS, BUT I FELT THAT -- AND I THINK THERE ARE -- THERE
2    WOULD BE SOUND BASES FOR DOING THAT.  THERE -- AS THE COURT, I
3    THINK, UNDERSTANDS, MR. DASKO'S BEHAVIOR -- BOTH IN THE CRIME
4    AND SINCE THEN, SINCE HIS ARREST -- I WANT TO ACKNOWLEDGE THE
5    DIFFERENCE BETWEEN WHEN HE WAS FIRST CONFRONTED AND ULTIMATELY
6    ARRESTED, BUT THOSE THINGS ALL MILITATE ALONGSIDE THE SORT OF
7    PERIDRAMATIC CASE THAT THESE GUIDELINES APPLY TO, SUGGESTING A
8    SIGNIFICANTLY BELOW GUIDELINE SENTENCE.
9           AND THE MORE -- THE MORE WE DUG INTO SIMILAR
10   SENTENCES, KNOWING THAT THE COURT WOULD LIKELY WANT SOMETHING
11   TO GRASP ONTO -- THAT IT'S NOT FAIR TO THE PUBLIC, TO THE
12   VICTIMS, TO THE COURT TO JUST THROW A NUMBER OUT OF THIN AIR --
13   AND THAT'S HOW WE LANDED AT 84 MONTHS.
14          THE -- SO LARGELY MY -- A LOT OF MY COMMENTS AND MY
15   ARGUMENT ARE ABOUT THE GUIDELINE RANGE BECAUSE THE CONDUCT IS
16   THE CONDUCT, AND THE COURT HAS A DEEP UNDERSTANDING OF THE
17   CONDUCT.  THE GUIDELINES HAVE BEEN -- WELL, I HOPE THAT TODAY'S
18   DISCUSSION -- AND, OBVIOUSLY, THE COURT CONTROLS AND CAN MAYBE
19   GUIDE US SOME IN OUR ARGUMENT -- BUT I HOPE THE DISCUSSION IS
20   WHERE, BELOW THE GUIDELINES, IS THE RIGHT SENTENCE BECAUSE IN
21   ONE REPORT THAT I BROUGHT WITH ME TODAY THAT I WANTED TO READ
22   SOME FROM IS THE SENTENCING COMMISSION'S REPORT ON THE CHILD
23   PORNOGRAPHY GUIDELINES FROM 2012.  IT'S NOT ONE THAT I CITED OR
24   QUOTED IN MY BRIEF, BUT IT'S MORE THAN A DECADE AGO THAT THE
25   SENTENCING COMMISSION SAID:  PRODUCTION OFFENDERS ENGAGED IN A
```

1    WIDE VARIETY OF OFFENSE BEHAVIOR, TYPICAL OFFENDER DURING THE

2    COURSE OF PRODUCTION AND DURING THE PRODUCTION HAD SEXUAL

3    CONTACT WITH A PRE-PUBESCENT MINOR.

4           A MINORITY OF OFFENDERS DIDN'T ENGAGE IN PHYSICAL

5    CONTACT WITH THEIR VICTIMS -- SO ALREADY MR. DASKO IS IN THE

6    MINORITY -- AND A SUBSET OF THOSE OFFENDERS WERE NEVER

7    PHYSICALLY PRESENT WITH THEIR VICTIMS BECAUSE THEY CAUSED THE

8    PRODUCTION REMOTELY.

9           SO AMONG PRODUCTION OFFENDERS, HE'S IN THE LEAST

10    CULPABLE CATEGORY.  THAT'S THE COMMISSION'S OWN EFFORT IN THEIR

11    2012 REPORT TO POINT OUT TO CONGRESS THAT EVEN THEN, A DECADE

12    AGO, FEWER COURTS WERE FOLLOWING 2G2.1, THE APPLICABLE

13    GUIDELINE HERE, THAN WERE FOLLOWING IT.  AND THAT TREND HAS

14    CONTINUED SINCE THEN.

15           IN THE SAME REPORT, THEY -- THE SENTENCING COMMISSION

16    RECOMMENDED TO CONGRESS THAT THE GUIDELINES BE REVISED BECAUSE

17    THEY PLACE A DISPROPORTIONATE EMPHASIS ON OUTMODED MEASURES OF

18    CULPABILITY, THAT THE SENTENCING SCHEMES RESULT IN OVERLY

19    SEVERE GUIDELINE RANGES FOR OFFENDERS BASED ON OUTDATED AND

20    DISPROPORTIONATE ENHANCEMENT.  AND, ULTIMATELY, THE REVISIONS

21    THAT THE COMMISSION RECOMMENDED A DECADE AGO, THAT THEIR OWN

22    GUIDELINES BE REVISED, SAID THEY SHOULD REFLECT CHANGES IN

23    OFFENSE CONDUCT AND KNOWLEDGE GAINED FROM EMERGING SOCIAL

24    SCIENCE RESEARCH AND ALSO BETTER ACCOUNT FOR THE VARIATIONS IN

25    OFFENDERS' CULPABILITY AND SEXUAL DANGEROUSNESS.

1    SO WITH THE SENTENCING COMMISSION'S OWN COMMENTS AND

2  RESEARCH ABOUT THEIR OWN GUIDELINES IN MIND, WE SET OUT TO TRY

3  TO SEE WHAT THAT RESEARCH IS AND WHAT WOULD IT SUPPORT.

4    AND IT TURNS OUT THAT ONE OF THE MAJOR FACTORS

5  INFLUENCING THE GUIDELINES AND CHANGING THEM REALLY FAR APART

6  FROM THE SUPPORTING RESEARCH WAS THE CHANGE IN THE BASE OFFENSE

7  LEVEL BY 5 LEVELS IN 2004.

8    THE COURT:  RIGHT.

9    MR. BOURASSA:  THAT THAT GUIDELINE CHANGE THAT THEY

10  DID TO ALIGN WITH MANDATORY MINIMUM SENTENCES -- THAT DON'T

11  APPLY HERE, BUT THAT DO IN THE OVERALL MAJORITY OF PRODUCTION

12  CASES -- SHIFTED THE GUIDELINE TO BEING WAY OUT OF WHACK WITH

13  OTHER OFFENSES.

14    AND I KNOW THE COURT HAS READ MY MEMORANDUM.  I WON'T

15  BELABOR THE POINT.  BUT MR. DASKO'S GUIDELINES THAT WE -- I

16  AGREE APPLY, A STRICT APPLICATION OF THE GUIDELINES PLACES HIM

17  VERY HIGH ON THE CHART, BUT IT PLACES HIM HIGHER THAN FOLKS WHO

18  HAVE KILLED VICTIMS, FOLK WHOSE HAVE COMMITTED HANDS-ON SEXUAL

19  OFFENSES.  SO IT'S VERY HARD TO COMPARE THE HARM OF DIFFERENT

20  CRIMES, BUT I THINK, PROBABLY, THERE'S CONSENSUS THAT THIS IS

21  NOT ON THE SAME ORDER OF MAGNITUDE AS A SECOND-DEGREE MURDER.

22    THE COURT:  AND BEFORE YOU MOVE ON, BECAUSE I WAS VERY

23  INTERESTED IN THE MANNER IN WHICH YOU LAID OUT THAT ARGUMENT

24  AND THE VARIOUS RESEARCHES AND CHARTS THAT YOU PROVIDED, I

25  WOULD LIKE TO HEAR FROM THE GOVERNMENT.

```
 1              WHAT IS THE GOVERNMENT'S VIEW WITH RESPECT TO THE
 2   ARGUMENT THAT A VARIANCE WOULD BE WARRANTED BASED ON THE
 3   CURRENT APPLICATION OF 2G2.1, I BELIEVE?
 4              MS. GRIFFITH:  WELL, YOUR HONOR, I APPRECIATE
 5   MR. BOURASSA'S ATTEMPTS TO WANT TO BASICALLY PICK US UP AND
 6   TRANSPORT US BACK IN TIME TO 10 YEARS AGO, BUT THERE'S NO
 7   DISCUSSION ABOUT THE MOST RECENT PRIMER THAT WAS RELEASED BY
 8   THE SENTENCING COMMISSION 2-AND-A-HALF YEARS AGO,
 9   RECOGNIZING -- AS WE HAVE LONG AGO -- THAT THE GUIDELINES WHEN
10   IT RELATES TO AT LEAST THE 2G2.2, THE TRAFFICKING GUIDELINES --
11   THE POSSESSION, RECEIPT, DISTRIBUTION -- THOSE GUIDELINES ARE
12   OUTMODED FOR REASONS THAT HAVE BEEN EXPLAINED AD NAUSEAM
13   AROUND -- PART OF THE REASONS WHY THOSE GUIDELINES HAVEN'T
14   CHANGED, EVEN THOUGH THE DEPARTMENT OF JUSTICE HAS ADVOCATED
15   THAT THEY CHANGE, THAT THE SENTENCING COMMISSION HAS ADVOCATED
16   THAT THEY CHANGE IS BECAUSE THE VAST MAJORITY OF THOSE SPECIFIC
17   GUIDELINE ENHANCEMENTS IN 2G2.2 ARE TIED TO STATUTORY SCHEMES.
18   THE ONLY WAY THOSE GET AMENDED IS NOT BY AN ACT OF THE
19   SENTENCING COMMISSION FOLLOWING A PROPOSAL AND A COMMENT AND
20   CRITIQUE SECTION BY THE LEGAL COMMUNITY; THEY CAN ONLY BE
21   CHANGED BY A LITERAL ACT OF CONGRESS.  AND, RESPECTFULLY, YOUR
22   HONOR, I DON'T KNOW THAT THERE'S THAT MANY CONGRESS
23   INDIVIDUALS -- MEN AND WOMEN -- WHO ARE OUT THERE WANTING TO
24   SAY:  THE SENTENCING GUIDELINES ARE TOO ROUGH FOR CHILD
25   PORNOGRAPHERS; WE NEED TO CHANGE THOSE.
```

1    AS A RESULT OF THAT, THERE HAVE BEEN EVALUATIONS, THE

2  SENTENCING COMMISSION REPORT THAT'S REFERENCED FROM 10 YEARS

3  AGO, AS WELL AS THE MOST RECENT PRIMERS THAT TALK ABOUT THINGS

4  THAT THE COURT SHOULD NEED TO FOCUS ON AFTER CONTEMPLATING WHAT

5  THE APPROPRIATE GUIDELINE RANGE IS, BECAUSE THAT'S WHAT THEY

6  ARE, IS THE UNIQUE SITUATIONS IN WHICH THE COURTS HAVE TO FACE

7  UNDER 3553; NAMELY, THE DEFENDANT'S ACCESS TO CHILDREN, THE

8  NUMBER OF -- YOU KNOW, HOW MANY VICTIMS ARE ASSOCIATED WITH

9  THOSE PARTICULAR CRIMES.  THOSE ARE THE THINGS THAT WE NEED TO

10  FOCUS ON, AND THAT'S WHAT WE WOULD LIKE TO ADDRESS.

11    I WOULD LIKE TO NOTE THAT, LOOKING BACK AT 1996 AND

12  2012 DIDN'T EVEN CONTEMPLATE THE TECHNOLOGY THAT'S CHANGED IN

13  THE LAST 10 YEARS.  PRODUCERS HAD TO BE IN THE SAME ROOM OR

14  HAVE AT LEAST A DECENT INTERNET CONNECTION TO BE ABLE TO

15  CONNECT WITH SOMEONE.  THE VERY TECHNOLOGY THAT ALLOWED DANIEL

16  DASKO TO HARM HIS VICTIMS IS BECAUSE OF THOSE PARTICULAR

17  CHANGES.

18    SO TO ASK THIS COURT TO SAY, WE ACKNOWLEDGE HE

19  COMMITTED THE CRIME BECAUSE OMEGLE ONLY EXISTED IN THE LAST 5

20  OR 6 YEARS, AND THE TECHNOLOGY AND THE HIGH-SPEED INTERNET AND

21  DSL CONNECTIONS THAT WE ARE ABLE TO MAKE WITH OUR

22  COCONSPIRATORS ACROSS THE COUNTRY -- WHOM WE HAVE NEVER EVEN

23  MET IN PERSON -- THAT THE ADVENT OF TOR AND THE DARK NET AND

24  ALL OF THESE TECHNOLOGICAL ADVANCES THAT ALLOW THIS HAPPEN, WE

25  ARE GOING TO DISREGARD THOSE BECAUSE BACK IN '96 AND 2012, THIS

```
 1    IS WHAT THE GUIDELINES WERE.  AND THEY DON'T -- NOBODY LOOKED

 2    IN 2012.  I WAS PROSECUTING THESE CASES BACK THEN, AND I

 3    COULDN'T EVEN CONTEMPLATE WHAT A TERABYTE OF INFORMATION WOULD

 4    BE.  NOW I CAN GO DOWN TO TARGET AND BUY A 2 TERABYTE COMPUTER

 5    WITHOUT ANY INCLINATION.  SO I THINK IT'S A SPECIOUS ARGUMENT

 6    TO ASK THIS COURT TO TURN BACK TIME AND DO THAT COMPARISON.

 7         I WOULD ALSO NOTE THAT DEFENSE COUNSEL TAKES THE

 8    ADJUSTED OFFENSE LEVEL OF 38 BEFORE ACCEPTANCE OF

 9    RESPONSIBILITY WHEN COMPARING THE OTHER, QUOTE, UNQUOTE, MORE

10    SERIOUS CRIMES OF SECOND-DEGREE MURDER, KIDNAPPING, WITHOUT ANY

11    SORT OF NUANCE WITH RESPECT TO THOSE BASE OFFENSE LEVELS ARE

12    SIMILAR BECAUSE CONGRESS AND THE COURTS HAVE RECOGNIZED

13    PRODUCTION IS DIFFERENT.

14         IF DANIEL DASKO HAD WALKED INTO HIS CLASSROOM AT HIS

15    SCHOOL AND WALKED UP TO THE VICTIM AND THE TWO OF THEM WERE IN

16    THE PRIVACY OF THEIR OWN HOME AND HE ASKED THAT VICTIM, GET

17    NAKED.  SEND ME SOME -- DO SOME ACTIVITIES SO I CAN RECORD IT,

18    EVERYBODY WOULD UNDERSTAND HOW RIDICULOUS AND ABSURD AND WRONG

19    IT WOULD BE.  BUT THE TECHNOLOGY THAT EXISTS TODAY THAT DIDN'T

20    EXIST IN 1996 -- THAT DIDN'T EXIST IN 2012 -- ALLOWS HIM TO DO

21    THAT.  HE GETS THE BENEFIT OF HIDING BEHIND THE COMPUTER

22    TECHNOLOGY TO COMMIT THE PARTICULAR CRIME.

23         THE ANONYMITY, THE PERMANENT NATURE OF IT, THE FACT

24    THAT THE TECH ALLOWS HIM TO VICTIMIZE DOZENS AND DOZENS AND

25    DOZENS OF CHILDREN IS THE REASON WHY WE HAVE TO ACCOUNT FOR THE
```

1    SEVERITY OF THE GUIDELINES AS THEY SIT, AND THAT IS WHY WE HAVE

2    TO LOOK AT THE ANALYSIS OF:  HERE'S THE GUIDELINES, AND NOBODY

3    IS DISPUTING THAT.

4          THE STABENOW ARGUMENTS -- AND AS APPEALING THOSE MIGHT

5    BE, THOSE RELATE SPECIFICALLY TO THE 2G2.2 PRINCIPLES.  I

6    APPRECIATE DEFENSE COUNSEL IS CORRELATING THOSE OVER TO 2G2.1,

7    BUT THE SAME CRITICISMS THAT HAVE BEEN LAUNCHED FOR THE LAST 10

8    YEARS AT THE CHILD PORNOGRAPHY GUIDELINES EXISTS ON THE

9    TRAFFICKING SIDE OF THINGS, NOT AT THE HANDS OF THE INDIVIDUAL

10   PRODUCERS.

11         AND TO SAY THAT WE SHOULD GO BACK TO THAT TIME WHEN WE

12   COULDN'T CONTEMPLATE THE TECH AND GIVE HIM A SENTENCE, I THINK

13   IS -- I THINK IS A SPECIOUS ARGUMENT AND IS DISINGENUOUS FOR

14   WHAT THIS COURT IS REQUIRED TO DO.

15         THE COURT:  THANK YOU.

16         I'M HAPPY TO HEAR FROM YOU EITHER ON THAT POINT OR IF

17   YOU WANT TO MOVE ON TO A DIFFERENT POINT.

18         MR. BOURASSA:  SURE, YOUR HONOR.  I THINK I ADDRESSED

19   MUCH OF COUNSEL'S ARGUMENTS IN MY MEMORANDUM.  I GUESS ALL THAT

20   I WOULD EMPHASIZE ARE WE DO QUOTE THE -- I THINK COUNSEL IS

21   REFERRING TO THE 2021 SENTENCING COMMISSION REPORT ON THE

22   PRODUCTION GUIDELINES.  WE QUOTE THAT AT LENGTH.  AND ONE OF

23   THE FEATURES OF THAT IS THE ACKNOWLEDGMENT THAT THE

24   OVERWHELMING MAJORITY OF FOLKS TO WHOM THAT GUIDELINE APPLIES

25   PRODUCED EXPLICIT MATERIAL WHILE PHYSICALLY TOUCHING THE MINOR.

1          THAT IS THE PERI DOGMATIC CASE TO WHICH THIS GUIDELINE

2    APPLIES AS RECENTLY AS 2021.  THAT'S NOT MR. DASKO'S CASE.

3          THE COUNSEL IS RIGHT THAT THE -- MUCH OF THE CRITICISM

4    LOBBED AT THESE GUIDELINES IS AIMED AT 2D2.2, THE GUIDELINE

5    THAT APPLIES IN POSSESSION/DISTRIBUTION CASES WITHOUT

6    PRODUCTION.

7          AS YOU POINTED OUT, 10 PERCENT OF THE CASES WHERE THAT

8    GUIDELINE APPLIES INVOLVE PRODUCTION TOO, AND THERE'S A FAIR

9    BIT OF -- PRESUMABLY WHAT THE COMMISSION THOUGHT IN 20- -- I

10   THINK IT'S 2020 WHEN THEY ISSUED THAT REPORT, THEY THINK THAT

11   THAT'S DERIVED FROM NEGOTIATION AMONG THE PARTIES AROUND

12   MANDATORY MINIMUMS AND APPLICABLE GUIDELINES AND THINGS, BUT

13   THERE'S NO -- THE RESULT IS THAT MR. DASKO'S CONDUCT COULD HAVE

14   FIT IN 2.2.  I AGREE THAT 2.1 APPLIES, BUT THE CRITICISM OF 2.2

15   THAT JUDGE BERZON -- THAT HENDERSON CASE PANEL THAT'S NOW

16   BINDING IN THE NINTH CIRCUIT, OF COURSE -- THE CRITICISM THAT

17   THEY ARE LOBBYING AGAINST THESE GUIDELINES IS NOT UNIQUE TO

18   2.2.  IT IS THAT THEY HAVE BEEN LARGELY DRIVEN BY CONGRESS --

19   AND COUNSEL IS MAKING THE SAME POINT AS WELL -- THAT CONGRESS

20   HAS PASSED A NUMBER OF LAWS THAT AFFECT 2G2.2 AND 2.1, AND THE

21   COMMISSION'S RESPONSE TO THAT HAS BEEN TO PROMULGATE GUIDELINES

22   THAT THEY -- THAT THEY ARE OBLIGATED TO BUT, AT THE SAME TIME,

23   TO SAY THAT THEIR OWN BEST EMPIRICAL RESEARCH SUGGESTS THAT THE

24   GUIDELINES ARE DEEPLY FLAWED.

25          I CAN MOVE ON, YOUR HONOR.  I THINK --

```
 1          THE COURT:  MR. BOURASSA, I'M HAPPY TO ALLOW YOU TO
 2   ARGUE FURTHER ANY OF THE DEPARTURES AND/OR VARIANCES THAT ARE
 3   INCLUDED IN YOUR SENTENCING MEMORANDUM.  YOU DON'T HAVE TO.  I
 4   DON'T WANT YOU TO FEEL THAT I AM PUTTING YOU ON THE SPOT.  I
 5   HAVE READ EVERYTHING, BUT I'M HAPPY TO GIVE YOU AN OPPORTUNITY
 6   TO ELABORATE FURTHER ON ANY OF YOUR ARGUMENTS, IF YOU WISH.
 7          MR. BOURASSA:  THANK YOU, YOUR HONOR.  I'LL ADDRESS --
 8   I WANT TO ADDRESS SOME THAT I FELT I HAD TO RELEGATE TO A
 9   FOOTNOTE BUT THAT ARE NONETHELESS SIGNIFICANT.
10          THE -- AS THE COURT KNOWS THAT OUR BRIEF IS OVERSIZED.
11   I WASN'T TOTALLY SURE WHAT THE LOCAL RULE WAS.  BUT ONE OF THE
12   FOOTNOTES THAT ADDRESSES THE DEPARTURE OR VARIANCE OR HOWEVER
13   YOU WANT TO TERM IT THAT THE GOVERNMENT FREQUENTLY RECOMMENDS
14   IN CASES THAT ARE CHILD PORNOGRAPHY OFFENSES NONETHELESS BUT
15   THAT INVOLVE AN EXPEDITIOUS RESOLUTION OF THE CASE.  I THINK IN
16   TERMS OF THE FACTS AND NEGOTIATION, WE HAVE DONE ALL THE THINGS
17   THAT WOULD HAVE QUALIFIED US FOR THAT IN TERMS OF THE COURT'S
18   VIEW.  BUT WE WERE NOT, IN NEGOTIATING, ABLE TO GET THE
19   GOVERNMENT TO AGREE TO THAT REDUCTION.  I THINK THE COURT
20   SHOULD NONETHELESS APPLY IT BECAUSE IT IS ONLY FAIR THAT THOSE
21   TYPES OF DEPARTURES AND VARIANCES BE APPLIED EQUALLY ACROSS
22   CASES.
23          MS. GRIFFITH:  YOUR HONOR, IF I CAN SPEAK TO THAT?
24          THE COURT:  I ACTUALLY WAS GOING TO ASK BOTH OF YOU TO
25   SPEAK TO THAT.
```

1          MS. GRIFFITH:  MY APOLOGIES, YOUR HONOR.  ON THE BALL.

2          THE DIFFERENCE IN THOSE PARTICULAR CASES IS, YES,

3    OTHER DEFENDANTS WHO HAVE SIMILARLY BEEN CHARGED WITH THE SAME

4    STATUTE HAVE BEEN GIVEN THAT OPPORTUNITY, BUT THOSE INDIVIDUALS

5    WEREN'T PRODUCERS.  SO THERE'S A REFERENCE, FOR EXAMPLE, IN

6    DEFENSE COUNSELS' EXHIBIT REGARDING PAUL TORRES.  IT'S ONE OF

7    THE, QUOTE, UNQUOTE, TEACHERS THAT DEFENSE COUNSEL AND HIS

8    PARALEGAL WERE ATTEMPTING TO KIND OF EQUATE.

9          MR. TORRES DIDN'T PRODUCE CHILD PORNOGRAPHY.  HE

10   DIDN'T TALK TO INDIVIDUALS.  WE HAVE AGREED TO EXPEDITIOUS

11   RESOLUTION IN THE TRAFFICKING BASE THAT STAY WITHIN 2G2.2 BUT

12   NOT FOR INDIVIDUALS WHO HAVE PRODUCED.  SO THAT IS THE

13   DIFFERENCE BETWEEN THE TWO.  EVEN THOUGH BOTH WERE CHARGED

14   UNDER THE SAME STATUTORY SCHEME, THE ACTUAL CONDUCT AND THE

15   CONTEMPLATION REGARDING THE PLEA AGREEMENT, BOTH OF THOSE

16   PARTICULARLY, ARE THE DIFFERENCE BETWEEN THE TWO.

17          THE COURT:  THANK YOU.

18          MR. BOURASSA:  AND, OF COURSE, YOUR HONOR, I RECOGNIZE

19   THAT DIFFERENT DEFENDANTS COMMIT DIFFERENT CRIMES, BUT THAT

20   DEPARTURE THAT WE ARE ASKING FOR IS PREDICATED UPON EXPEDITED

21   RESOLUTION OF THEIR CASES.

22          THE COURT:  AND, MS. GRIFFITH, THAT'S WHAT I WANTED TO

23   HEAR FROM YOU.

24          MS. GRIFFITH:  YOUR HONOR, AT THE TIME WHEN THOSE WERE

25   IMPLEMENTED AND CERTAINLY WITH MR. TORRES'S CASES, THEY WERE A

1     COMBINATION OF EXPEDITIOUS RESOLUTION AND BECAUSE OF COVID-19.

2          AS YOU KNOW, THESE PARTICULAR CASES CANNOT FALL WITHIN

3     A STATUTORY SCHEME OF FAST TRACK.  SO IN THE SAME WAY THAT WE

4     WOULD TREAT A BORDER BUST DEFENDANT AND AN OCF DEFENDANT BOTH

5     CHARGED WITH THE SAME TYPE OF CRIME, THEY GET DISPARATE

6     TREATMENT.  THAT'S THE SAME WAY WE FEEL -- THIS OFFICE LOOKS AT

7     CHILD EXPLOITATION CRIMES AS INDIVIDUALS WHO -- I'M GOING TO

8     USE THIS TERM VERY LOOSELY -- JUST TRAFFICKING IN THE CHILD

9     PORNOGRAPHY WITH POSSESSION, DISTRIBUTION, OR RECEIPT AND NOT

10    ENGAGING IN ANY ONLINE CONTACT WITH CHILDREN DIRECTLY ARE GOING

11    TO BE TREATED DIFFERENTLY THAN THOSE, EVEN THOUGH THEY ARE

12    CHARGED THE SAME.

13         I DON'T DISPUTE THE FACT THAT THIS CASE DID

14    RESOLVE WITHOUT -- AFTER WE GOT OVER THE BOND ISSUES, THERE

15    WASN'T ANY SIGNIFICANT LITIGATION.  I THINK THE PARTIES WERE

16    ALWAYS WORKING TOWARDS RESOLUTION.  BUT IN TERMS OF WHAT WOULD

17    BE AN APPROPRIATE PARTICULAR SENTENCE, WE DID NOT FEEL THAT IT

18    WAS APPROPRIATE, AND NOR DO WE DO THAT IN PRODUCTION CASES.

19              THE COURT:  VERY WELL.  THANK YOU.

20              MR. BOURASSA:  YOUR HONOR, MY LAST COMMENT ON THIS,

21    AND I'LL MOVE ON.  I PROMISE.

22         I JUST WANTED TO ALERT THE COURT THAT THE TWO EXAMPLE

23    CASES THAT I WAS ABLE TO IDENTIFY -- AND I DID NOT DO AN

24    EXHAUSTIVE SEARCH FOR THIS EXPEDITIOUS RESOLUTION DEPARTURE --

25    THEY WERE FILED IN 2022, THE SAME YEAR AS MR. DASKO'S CASE.  I

1    DON'T KNOW THE EXACT DATES, BUT THEY WERE NOT APRIL 2020 COVID

2    VARIANCES.  THEY WERE EXPEDITIOUS RESOLUTION DEPARTURES LAST

3    YEAR.

4         MS. GRIFFITH:  YOUR HONOR, I DO WANT TO CLARIFY

5    BECAUSE I THINK FACTS ARE IMPORTANT.  MR. TORRES, WHO WAS

6    SENTENCED, HIS SENTENCE HAPPENED IN 2022, BUT HE REMAINED IN

7    CUSTODY THE ENTIRE TIME DURING THE COVID PANDEMIC.

8         THE COURT:  SO THE EXPEDITIOUS RESOLUTION VARIANCE OR

9    DEPARTURE WAS EXTENDED IN LIGHT OF THE CIRCUMSTANCES?

10        MS. GRIFFITH:  EXACTLY, YES.

11        AND HE WAS IN CUSTODY THE ENTIRE TIME BECAUSE HE WAS

12   ARRESTED SHORTLY BEFORE.  AND THEN THERE WERE INDIVIDUALS

13   SIMILARLY SITUATED THAT HAD LATER SENTENCES THAT, BECAUSE OF

14   COVID, THEY WERE NOT ABLE TO GET INTO THE OFFICE.  AND THE

15   COURTS RECOGNIZE THOSE DEFENDANTS WERE FACING MANDATORY

16   MINIMUMS, SO THEY WERE NOT GIVEN THE PRIORITY IN TERMS OF

17   SENTENCING AS WELL.

18        SO I DO THINK THE FACTUAL DISTINCTION IS IMPORTANT.

19        MR. BOURASSA:  AND, YOUR HONOR, I -- I AGREE THAT

20   FACTS MATTER.  I HOPE THAT GOES WITHOUT SAYING.

21        MR. TORRES'S CASE APPEARS IN OUR CHART IN THE

22   APPENDIX.  IT WASN'T FILED IN 2020.  THE CASES THAT WE CITE FOR

23   THE EXPEDITIOUS RESOLUTION ARE MR. PUSHKINS [PHONETIC] CASE AND

24   MR. MOSES'S [PHONETIC] CASE.  THEY ARE FOOTNOTE 27 OF OUR

25   MEMORANDUM.

1          MS. GRIFFITH:  AND NEITHER OF THOSE DEFENDANTS, YOUR

2     HONOR, HAD PRODUCTION CHARGES.

3          THE COURT:  ALL RIGHT, COUNSEL.

4          ANYTHING ELSE, MR. BOURASSA?

5          MR. BOURASSA:  THE -- ONE OF THE FEATURES THAT I KNOW

6     LOOMS LARGE FOR MR. DASKO AND HIS FAMILY IN THIS CASE IS THEIR

7     FEAR THAT HE -- HIS SENTENCE WILL END UP SO LONG THAT THE WORLD

8     HE'S RELEASED INTO IS NOT RECOGNIZABLE TO HIM, THAT HIS LOVED

9     ONES MAY NOT, UNFORTUNATELY, BE ALIVE.  YOU KNOW, AS THE COURT

10    KNOWS OUR RECOMMENDED SENTENCES ARE VERY FAR APART.

11          THE COURT KNOWS ABOUT HIS MOTHER'S HEALTH.  BUT THERE

12    IS GOING TO BE A DAY -- AND I UNDERSTAND SOME PEOPLE WANT THAT

13    DAY TO BE AS FAR IN THE FUTURE AS CONCEIVABLE -- BUT THERE'S

14    GOING TO BE A DAY WHERE MR. DASKO WALKS OUT OF PRISON AND HE IS

15    IN TREATMENT.  HE'S SUBJECT TO THE COURT'S SUPERVISION.  HE MAY

16    END UP SUBJECT TO HOME CONFINEMENT UNDER COURT SUPERVISION.

17    HE'S GOING TO BE PROHIBITED FROM HAVING DEVICES.  HE IS GOING

18    TO BE PROHIBITED FROM LOITERING ANYWHERE NEAR CHILDREN.  THE

19    COURT KNOWS HOW INVOLVED HIS SUPERVISED RELEASE CONDITIONS ARE

20    LIKELY TO BE.  WE HAVEN'T OBJECTED TO ANY OF THAT HERE.

21    IT'S -- FOR BETTER OR WORSE, IT'S SOMETHING THAT MR. DASKO, IN

22    A LATER ERA OF HIS LIFE, IS GOING TO HAVE TO DEAL WITH.

23          BUT ALL OF THOSE THINGS, COUPLED WITH THE FACT THAT

24    HE -- THAT THE COMMUNITY WILL BENEFIT IF MR. DASKO HAS FAMILY

25    WHO ARE ABLE TO SUPPORT HIM IN THAT TRANSITION PROCESS.  THE

1    COMMUNITY WILL BENEFIT IF HE HAS A PLACE TO STAY WHILE HE FINDS

2    NEW WORK IN A TOTALLY NEW FIELD, WHILE HE NAVIGATES THE

3    REGISTRATION REQUIREMENTS.  THE COMMUNITY WILL BE SAFER IF THAT

4    TRANSITION CAN BE PLANNED WITH HIS FAMILY, RATHER THAN RELEASE

5    INTO THE UNITED STATES WITH HIS BROTHER LIVING IN CANADA

6    SUBJECT TO ALL OF THESE CONDITIONS AND ALONE, EXCEPT FOR HIS

7    SEX OFFENDER TREATMENT.

8         AND SO UNLESS THE COURT HAS OTHER QUESTIONS, I WANT TO

9    AT LEAST RESERVE SOME OPPORTUNITY TO RESPOND TO THE

10   GOVERNMENT'S ARGUMENTS.  BUT WE SUBMIT THAT THAT DAY, WHEN

11   MR. DASKO SLOWLY TRANSITIONS OUT OF PROBABLY A RE-ENTRY CENTER

12   TO SOME SORT OF HALFWAY HOUSE TO, HOPEFULLY, A RESIDENCE WHERE

13   HE'S SUPPORTED BY FRIENDS AND FAMILY SHOULD BE AROUND 2030

14   RATHER THAN 2040.

15        I THINK I SAID BRIEFLY AT THE CONCLUSION OF MY

16   MEMORANDUM, BUT TO EMPHASIZE THAT THE COURT'S SENTENCE HERE

17   TODAY IS MR. DASKO'S SENTENCE.  HE'S NOT ELIGIBLE FOR FIRST

18   STEP ACT CREDITS THAT WOULD REDUCE IT SUBSTANTIALLY.

19        AND WITH THAT, I'LL SUBMIT.

20        THE COURT:  I APPRECIATE IT.

21        SO, MR. DASKO, YOU DON'T HAVE TO SAY ANYTHING.  I HAVE

22   READ YOUR LETTER.  BUT IF THERE IS ANYTHING ELSE YOU WISH TO

23   SHARE WITH ME, I AM HAPPY TO HEAR FROM YOU.

24        MR. BOURASSA:  YOUR HONOR, IF THE COURT WILL PERMIT

25   IT, I THINK MR. DASKO HAD HOPED TO READ HIS LETTER TO THE

1   VICTIMS.  I KNOW THE COURT HAS ALREADY SEEN IT, BUT

2   UNDERSTANDING THERE ARE SOME FOLKS THAT ARE PRESENT.

3          I'LL TURN IT OVER.

4          THE COURT:  ABSOLUTELY.  AND JUST MAKE SURE YOU BRING

5   THE MICROPHONE CLOSE TO YOU.

6          THE DEFENDANT:  TO MY VICTIMS, I'M SORRY THAT I'LL

7   NEVER BE ABLE TO MAKE DIRECT AMENDS TO YOU.  I'M SURE YOU ALL

8   CARRY THIS UNWANTED BURDEN ON YOUR SHOULDERS EVERY DAY AND WILL

9   CONTINUE TO DO SO FOR THE REST OF YOUR LIVES.

10         I'M APPRECIATIVE THAT SOME OF YOU HAVE CHOSEN TO SPEAK

11  OUT, AS YOU DESERVE TO HAVE YOUR VOICES HEARD.

12         I LOOK BACK ON WHAT I DID AND FEEL SORROW AND SADNESS.

13  I ALWAYS WILL, AND I DESERVE TO CARRY A GREAT BURDEN FOR WHAT I

14  HAVE DONE TO YOU.  I HAVE BETRAYED YOU AND THAT MAY BE

15  SOMETHING YOU ARE STUCK WITH FOREVER.  YOU ALL TRUSTED ME AND

16  DESERVED TO BE ABLE TO TRUST IN ME.  I AM TRULY SORRY FOR ALL

17  OF THE PAIN AND SUFFERING I HAVE CAUSED EACH AND EVERY ONE OF

18  YOU.  I CANNOT GO BACK AND FIX WHAT I HAVE DONE.  REGARDLESS OF

19  WHAT HAPPENS TODAY, IT WILL HAUNT ME FOREVER, AND TRULY I AM

20  SORRY.

21         THE COURT:  THANK YOU, MR. DASKO.

22         MS. GRIFFITH, I'M HAPPY TO HEAR FROM YOU.

23         MS. GRIFFITH:  YOUR HONOR, WOULD THE COURT LIKE TO

24  HEAR FROM THE VICTIM'S MOTHER?

25         THE COURT:  IN WHICHEVER ORDER.

1    MS. GRIFFITH:  YES, YOUR HONOR.  I THINK WE ARE READY

2  TO HAVE HER SPEAK.  AND CONSISTENT WITH THE COURT'S PROTECTIVE

3  ORDER AND TALKING WITH DEFENSE COUNSEL, WE ARE GOING TO

4  CONTINUE FOR THE RECORD TO REFER TO HER AS "THE MINOR VICTIM'S

5  MOTHER," AS OPPOSED TO BY HER NAME.

6    SHE HAS PREPARED A STATEMENT.

7    THE VICTIM:  GOOD MORNING, JUDGE LOPEZ.  OBVIOUSLY,

8  I'M THE MOTHER OF THE MINOR VICTIM.

9    THIS IS A HORRIBLE SITUATION.  I AM EXTREMELY

10  GRATEFUL, HOWEVER, FOR THE OPPORTUNITY TO SHARE WITH THE COURT

11  HOW MR. DASKO'S CRIMES HAVE AFFECTED MY SON AND OUR FAMILY.  TO

12  COMMUNICATE THAT, I NEED TO GO BACK IN TIME TO 2021.  THAT WAS

13  A TIME OF ISOLATION, LONELINESS, AND DESPAIR FOR ALMOST ALL OF

14  US.  WE ALL STRUGGLED THROUGH THE PANDEMIC.

15    CHILDREN FACED SOME UNIQUE CHALLENGES.  MY SON WAS 13

16  AT THE TIME.  HE WAS IN MIDDLE SCHOOL.  HE FACED ALL OF THE

17  TYPICAL MIDDLE SCHOOL STRUGGLES:  CLIQUES, BULLIES, FEARS OF

18  NOT FITTING IN.  AND THIS WAS COMPOUNDED BY SOCIAL DISTANCING

19  AND THE LACK OF HIS USUAL OUTLETS, SUCH AS BEING WITH FRIENDS

20  AND SPORTS.

21    HOWEVER, I FELT LUCKY THAT MY CHILDREN COULD ATTEND

22  SCHOOL IN PERSON DURING A TIME WHEN SO MANY SCHOOLS WERE

23  CLOSED.  THAT WAS UNUSUAL, AND I WAS LUCKY.  I WAS GRATEFUL.

24    COVID STRAINED THE STAFFING AND RESOURCES OF OUR

25  SCHOOL, AND WE RELIED ON AN UNPRECEDENTED NUMBER OF SUBSTITUTE

1    TEACHERS, ONE OF THEM BEING MR. DASKO.  MY CHILDREN SEEMED TO

2    LIKE HIM.  THEY SAID HE WAS SO NICE.  I WOULD HEAR OVER DINNER:

3    MR. DASKO'S SO FUNNY.  MR. DASKO IS THE BEST.  AND I WAS HAPPY.

4    I WAS HAPPY THAT THERE WAS AN ENTHUSIASTIC, ENGAGED TEACHER WHO

5    MADE MY KIDS EXCITED TO BE AT SCHOOL.  AND I WAS GRATEFUL THAT

6    THERE WERE TEACHERS WILLING TO SHOW UP AND TEACH IN PERSON WHEN

7    SO MANY COULD NOT.

8            I WAS HAPPY THAT THERE WERE PEOPLE WILLING TO GUIDE

9    OUR CHILDREN THROUGH THE FEAR AND UNCERTAINTY OF A PROLONGED

10   LOCKDOWN.

11           LITTLE DID I KNOW.  I KNEW MY SON FELT LONELY AND

12   DISCONNECTED FROM HIS FRIENDS.  I KNEW HE WAS IN THE THROWS OF

13   PUBERTY WITH ALL OF ITS ASSOCIATED HORMONE SURGES, SEXUAL

14   URGES, AND CURIOSITY -- ALL THINGS THAT ARE SO NORMAL FOR A

15   TEENAGE BOY TO EXPERIENCE.

16           I KNEW THE DANGERS OF THE INTERNET, AND I WORKED HARD

17   TO LIMIT THE ACCESS THAT MY CHILDREN HAD TO SCREENS.  BUT COVID

18   NECESSITATED A SOFTENING OF THOSE BOUNDARIES.  I KNEW THAT

19   BEING ONLINE GAVE MY SON AND HIS FRIENDS A SENSE OF COMMUNITY

20   AND CONNECTEDNESS THAT THEY LACKED.

21           I DID NOT KNOW THAT ALEX, SUPPOSEDLY A 13-YEAR-OLD

22   GIRL, WAS REPEATEDLY MESSAGING MY SON AND SENDING SEXUALLY

23   EXPLICIT PHOTOS OF HERSELF.  I DID NOT KNOW SHE REPEATEDLY

24   ASKED HIM TO RECIPROCATE.  AND I MOST CERTAINLY DID NOT KNOW

25   THAT ALEX WAS, IN FACT, NOT A GIRL AT ALL BUT AN ELABORATE AND

1    SOPHISTICATED TRAP SET BY MR. DASKO AND HIS COPEDOPHILES.

2        IT IS IMPOSSIBLE FOR ME TO ADEQUATELY COMMUNICATE THE

3    SENSE OF SHAME THIS BROUGHT TO MY SON.  WATCHING MY ONCE HAPPY,

4    BUBBLY, OUTGOING BOY BE ENGULFED IN DESPAIR FILLED ME WITH A

5    DESPONDENCE THAT I HAD NEVER KNOWN.

6        WHEN WE FIRST LEARNED OF MR. DASKO'S ARREST AND

7    UNDERSTOOD THE TRUE NATURE OF "ALEX," MY SON WANTED TO DIE

8    BECAUSE HE COULDN'T FACE THE ANGUISH AND HUMILIATION.  TIME AND

9    THERAPY HAVE BEEN HELPFUL, BUT HIS SENSE OF SHAME AND DEEP

10   EMBARRASSMENT PERSISTS, AS IS THE TERROR THAT PEOPLE WILL FIND

11   OUT.

12       HE ALSO IS FEARFUL -- RIGHTFULLY SO -- THAT HIS IMAGES

13   WILL CONTINUE TO CIRCULATE ON THE INTERNET.

14       MY HEART BREAKS FOR HIM.  I HOPE THAT SOMEDAY HE WILL

15   BE ABLE TO FORGIVE HIMSELF AND RECOGNIZE THAT HE WAS ONLY THE

16   PAWN IN DASKO'S EVIL PURSUIT.

17       WITNESSING MY SON'S SELF-LOATHING HAS BEEN AN AGONY

18   THAT IS INDESCRIBABLE FOR ME, MY HUSBAND, MY DAUGHTER.  I HOPE

19   HE NEVER SEARCHES THE PUBLIC RECORD TO READ THE CHATS ABOUT HIM

20   BETWEEN MR. DASKO AND HIS COPREDATORS.  I HOPE MY OWN SENSE OF

21   GUILT AND FAILURE AND POWERLESSNESS TO HELP HIM ABATE OVER

22   TIME.

23       BEING HERE TODAY TO ADDRESS THE COURT AND TO FACE

24   MR. DASKO IS AN IMPORTANT STEP IN MY OWN HEALING.

25       AUGUST 24, 2022, WILL ALWAYS BE A VERY PAINFUL MEMORY

1    FOR ME.  MY HUSBAND, SON, AND I MET WITH THE FBI.  BY THAT

2    POINT, WE HAD ALREADY READ SPECIAL AGENT EVANS' DECLARATION, SO

3    WE KNEW WHAT WE WERE WALKING INTO.  WE UNDERSTOOD THAT OUR SON

4    HAD BEEN MANIPULATED INTO SENDING SEXUALLY GRAPHIC IMAGES TO

5    ALEX.  I WASN'T EXPECTING SURPRISES FROM THIS INTERVIEW.  I

6    KNEW MY SON WAS DEEPLY EMBARRASSED.  BUT I WAS WHOLLY

7    UNPREPARED FOR HIS GRIEF.

8         I WILL NEVER FORGET THE RIDE HOME AS HE SOBBED AND

9    SOBBED SAYING OVER AND OVER AGAIN:  I THOUGHT HE WAS MY FRIEND.

10   TEMPORARILY, HIS SENSE OF SHAME AND EMBARRASSMENT WAS DISPLACED

11   BY AN UTTER SENSE OF ABJECT BETRAYAL AND DEVASTATION.  AND

12   SEEING THAT WAS ALMOST HARDER.

13        I HAD HOPED HE WOULD BE HERE TODAY TO DESCRIBE

14   FIRSTHAND HOW THIS HAS AFFECTED HIM.  HE HAS MADE SIGNIFICANT

15   IMPROVEMENT IN HIS FEELINGS OF SELF-WORTH, BUT HIS SENSE OF

16   BETRAYAL AND REVULSION WITH MR. DASKO IS SIMPLY TOO SIGNIFICANT

17   FOR HIM TO BE HERE.  I HOPE MY PRESENCE IS AN ADEQUATE

18   SUBSTITUTE.

19        I AM NOT THE DIRECT VICTIM, BUT I FEEL COMPELLED TO

20   SHARE WITH THE COURT HOW PAINFUL IT HAS BEEN TO WATCH MY SON'S

21   SUFFERING AND FEEL POWERLESS TO RELIEVE IT.

22        OVER THE PAST 15 MONTHS, MY OWN EMOTIONS HAVE RUN THE

23   GAMUT FROM SHOCK AND DISBELIEF TO SHOCK, TO ANGER, SADNESS, AND

24   RESIGNATION.  BUT TODAY, I AM LEFT PRIMARILY WITH DISGUST.  I

25   AM DISGUSTED THAT A TEACHER WOULD DELIBERATELY SOLICIT

1    RELATIONSHIPS WITH VULNERABLE STUDENTS SIMPLY FOR THE PURPOSES

2    OF SEXUALLY EXPLOITING THEM.  I AM DISGUSTED BY THE SCHEMING OF

3    THE DEFENDANT TO STAY PHYSICALLY CLOSE TO MY SON, ORCHESTRATING

4    CHAPERONING HIM SPECIFICALLY ON THE SCHOOL FIELD TRIP AND

5    SUPERVISING THE 8TH GRADE GRADUATION PARTY.  BUT MOST OF ALL, I

6    AM DISGUSTED BY WHAT I BELIEVE TO BE AN UTTER LACK OF REMORSE

7    AND ACCOUNTABILITY ON THE PART OF DEFENDANT.

8         I FEEL INSULTED READING HIS WRITTEN STATEMENTS IN

9    ADVANCE OF TODAY'S HEARING.  HE WRITES A LENGTHY LETTER TO THE

10   COURT TO ASK FOR LENIENCY, DELINEATING HIS WORK TO IMPROVE

11   HIMSELF AND EXPRESSING REGRET FOR HOW THIS HAS AFFECTED HIS

12   FAMILY AND DERAILED HIS OWN LIFE.  BUT THE VICTIMS ARE AN

13   AFTERTHOUGHT.  HE TOUTS HIS STRONG WORK ETHIC AND PONDERS

14   FUTURE CAREERS, YET ONLY MARGINALLY REFERENCES THE CHILDREN

15   THAT HE VICTIMIZED.  HE CLAIMS TO MAKE -- HE SAYS HE WOULD LIKE

16   TO MAKE AMENDS, BUT HE HAD THE OPPORTUNITY TO DO SO.  AND IN

17   HIS LETTER TO THE VICTIMS -- WHICH WAS 165 WORDS, ONE 10TH OF

18   WHAT HIS PLEADING TO THE COURT WAS ASKING FOR LENIENCY.  165

19   WORDS, A RATHER TEPID APOLOGY TO HIS VICTIMS.  HE WROTE

20   LENGTHIER CHATS AS "MR. PICKLES."

21        I AM COMPELLED TO NOTE THE QUOTE HE INCLUDED IN HIS

22   OWN PLEADING FROM OTHELLO.  "I AM NOT WHAT I AM."  HE SAYS THIS

23   RESONATES WITH HIM, AND I AM SURE IT MUST.  IAGO IS THE VILLAIN

24   IN OTHELLO.  AND HE USES THOSE WORDS TO DESCRIBE TO RODRIGO HOW

25   HE IS PRETENDING TO BE A TRUSTED FRIEND TO OTHELLO WHILE

 1    ACTUALLY PLOTTING HIS DOWNFALL.

 2            I FIND IT CURIOUS THAT MR. DASKO SELECTED THAT

 3    REFERENCE, BUT I ALSO FIND IT EXCEPTIONALLY APPROPRIATE BECAUSE

 4    IAGO IS THE VERY EMBODIMENT OF A PREDATOR MASQUERADING AS A

 5    CONFIDANT.

 6            MR. DASKO, YOU ARE PRECISELY WHAT YOU ARE.

 7            YOUR HONOR, I ASK YOU TO SENTENCE MR. DASKO IN

 8    ACCORDANCE WITH THE GOVERNMENT'S WISHES OF 210 MONTHS.  A

 9    SENTENCE OF THIS LENGTH CONVEYS THE GRAVITY OF HIS ACTIONS AND

10    WILL HOPEFULLY BE A DETERRENT TO HIS PEERS.

11            MR. DASKO'S CRIMES WERE NOT MERELY A MISTAKE OR A

12    RABBIT HOLE HE FOLLOWED DURING COVID.  HE IS NOT A MERE VICTIM

13    OF HIS ADDICTION OR AN UNDIAGNOSED ILLNESS OR A STRUGGLE WITH

14    HIS OWN SEXUALITY.  HE IS A CALCULATING AND SCHEMING PREDATOR

15    WHO TARGETED HIS OWN STUDENTS AND MUST NOW FACE THE CONSEQUENCE

16    OF THOSE ACTIONS.

17            HE HAS DEMONSTRATED A PERVASIVE PATTERN OF PREDATION

18    THAT MAKES HIM A DANGER TO CHILDREN IF NOT INCARCERATED.

19            THANK YOU.

20            THE COURT:  BEFORE YOU LEAVE FROM THE PODIUM -- CAN

21    YOU COME BACK?

22            THANK YOU.  I APPRECIATE YOU STANDING HERE AND SHARING

23    YOUR THOUGHTS.  I KNOW YOU SAID IT WAS A LETTER, AND I DON'T

24    THINK YOU LOOKED DOWN AT THAT PAPER ONCE.  SO I KNOW THAT YOU

25    SHARE YOUR WORDS JUST FROM THE BOTTOM OF YOUR HEART.

1       I WANT TO LEAVE YOU WITH A COUPLE OF THOUGHTS:  DO

2  YOUR BEST TO RID YOURSELF OF ANY GUILT.  YOU DID NOTHING WRONG.

3  YOU DID NOTHING WRONG.

4       THERE IS NOTHING REALLY THAT PARENTS CAN DO THESE DAYS

5  TO STOP THEIR CHILDREN FROM ACCESSING THE INTERNET.  EVEN IF

6  YOU DON'T GIVE THEM A DEVICE, A FRIEND WILL HAVE ONE.  EVEN IF

7  YOU TAKE THEIRS, SOMEONE ELSE WILL FIND ONE.  YOU TAKE A PHONE,

8  THEY CAN GO ON THROUGH THEIR COMPUTER.

9       YOU DID NOTHING WRONG; IN FACT, YOU'VE DONE EVERYTHING

10  RIGHT.  AND BEING THERE TO SUPPORT YOUR SON -- TO GET HIM THE

11  THERAPY THAT HE NEEDS, TO REMIND HIM THAT HE DOESN'T NEED TO BE

12  ASHAMED, AND THAT HE'S LOVED -- THAT'S WHAT YOU NEEDED TO DO.

13  YOU HAVE DONE THAT.  I APPRECIATE YOU COMING HERE TODAY.

14       THE VICTIM:  THANK YOU, YOUR HONOR.

15       THE COURT:  MS. GRIFFITH, IS THERE ANYTHING YOU WISH

16  TO ADD?

17       MS. GRIFFITH:  JUST BRIEFLY, YOUR HONOR.  I DON'T

18  THINK I CAN SAY ANYTHING BETTER THAN WHAT THE VICTIM'S MOTHER

19  HAS JUST SAID.

20       BUT I DO WANT TO POINT OUT THIS NOTION THAT SOMEHOW

21  BECAUSE THIS ALL EXISTED IN AN ONLINE WORLD MAKES IT LESS

22  TRAGIC, THAT THE RELIANCE ON THE FACT THAT PRODUCTION CASES

23  USUALLY INVOLVE HANDS-ON MOLEST IGNORES THE FACT THAT THE

24  REALITY FOR THESE CHILDREN IS THEIR WORLD IS ONLINE.  THAT IS

25  WHERE THEY LIVE.  THEY DON'T NEED TO GO OUT INTO THE PUBLIC,

 1   NECESSARILY.  THIS IS WHERE THEY FEEL SAFE.  AND CERTAINLY

 2   DURING THE PANDEMIC, IT'S WHERE ALL OF US WERE LIVING.

 3          AND SO THE FACT THAT THE DEFENDANT AND HIS

 4   COCONSPIRATORS CAN USE THAT SAME TECHNOLOGY TO THEIR BENEFIT

 5   FOR THEIR OWN SEXUAL PLEASURE, TO CONNECT -- MR. DASKO HAD

 6   NEVER MET HIS TWO COCONSPIRATORS.  THEY DIDN'T NEED TO.  BUT

 7   OVER THE SHARED BOND THAT THE THREE OF THEM DEVELOPED OVER THE

 8   INTERNET WAS ENOUGH TO DRIVE THIS CONSPIRACY.

 9          AND THIS WASN'T A ONE-OFF-TYPE SITUATION, YOUR HONOR.

10   YOU HAVE A YEAR'S WORTH OF CHATS THAT ARE BEFORE THE COURT, 750

11   PAGES, WITH EXCERPTS OF THEM.  AND I PROMISE YOU THEY ARE

12   REPETITIVE.  THEY ARE OVER.  WE -- COCOUNSEL AND I DEBATED, DO

13   WE GIVE YOU ALL OF THEM?  AT SOME POINT IN TIME, IS THERE

14   DIMINISHING RETURNS BECAUSE JUST THE NATURE OF THEM IS SO -- IS

15   SO JUST DISGUSTING.

16          AGAIN, IF MR. DASKO HAD WALKED IN AND ASKED EVERY ONE

17   OF HIS STUDENTS THAT HE SENT THAT INFORMATION TO, TO ALEX, AND

18   ASKED THEM TO DO THOSE THINGS, WE WOULD BE HORRIFIED.

19          AND IT'S VERY DISTURBING TO THE GOVERNMENT THAT WE'RE

20   GOING TO APPLAUD MR. DASKO'S PROGRESS IN TREATMENT BECAUSE WHY

21   DID HIS REVELATION ABOUT WHAT HE WAS DOING WAS WRONG HAVE TO

22   COME ON THE BACKS OF THE DOZENS AND DOZENS AND DOZENS OF

23   CHILDREN THAT HE VICTIMIZED?

24          HE DIDN'T HAVE TO GO PHYSICALLY IN THEIR OWN HOMES

25   BECAUSE HE WAS INVITED THERE, AND HIS MOTHER WROTE AT THE END

1    OF HER LETTER TO THIS COURT THAT MY SON IS HONEST.  MY SON IS

2    TRUTHFUL.

3         AND TO HIS CREDIT, WHEN CONFRONTED WITH LAW

4    ENFORCEMENT FOR THE SECOND TIME, HE WAS ON HONEST AND HE HASN'T

5    NEGATED HIS CRIMINAL CULPABILITY HERE.

6         BUT IF HE IS THAT HONEST, THEN WE CAN TRUST THE WORDS

7    THAT HE WROTE IN THOSE CHATS BECAUSE THAT IS THE PERSON THAT

8    DANIEL DASKO IS AS WELL.

9         AND THE SENTENCE ISN'T JUST ABOUT MR. DASKO IN

10   RELATION TO OTHER DEFENDANTS OR MR. DASKO IN RELATION TO THE

11   ARBITRARY AND CAPRICIOUSNESS OF THE GUIDELINES.  THE SENTENCE

12   IS ABOUT HOLDING MR. DASKO ACCOUNTABLE, BUT ALSO TELLING

13   EVERYBODY SIMILARLY SITUATED TO MR. DASKO:  THIS IS

14   UNACCEPTABLE.

15        AND I WOULD HIGHLIGHT FOR THE COURT THAT EVEN HIS

16   COCONSPIRATORS GETTING PROSECUTED DIDN'T STOP HIM.  BY HIS OWN

17   ADMISSION, ONLY A COUPLE OF WEEKS BEFORE THE FBI KNOCKED ON HIS

18   DOOR, HE WAS BACK AT IT AGAIN.  THE ONLY THING HE DID WAS

19   DELETE THE EVIDENCE OF HIS CRIME.

20        AND AS YOU HAVE ALREADY POINTED OUT, HE HAD CONTACT IN

21   OCTOBER OF 2020 AND THAT DIDN'T DISSUADE HIM.

22        THE SENTENCE IS NOT ONLY ABOUT WHAT MR. DASKO DID, BUT

23   IT'S ABOUT A MESSAGE TO THE MEMBERS OF THE COMMUNITY, HIS OWN

24   FAMILY, ALL OF THE INDIVIDUALS THAT HE HAS IMPACTED BECAUSE HIS

25   CHARGE MIGHT BE ONE, BUT THAT VICTIM AND HIS MOTHER ARE A

1    MICROCOSM OF THE DOZENS AND DOZENS OF CHILDREN THAT HE

2    IMPACTED.

3         AND THE FACT THAT IT TOOK PLACE ALL ONLINE SHOULD ONLY

4    SPEAK TO THE EGREGIOUSNESS OF IT AND THE PROLIFERATION OF IT

5    AND SHOULDN'T BE USED TO DISCOUNT IT.

6         SO FOR ALL OF THE REASONS WE HAVE INCLUDED IN OUR

7    SENTENCING MEMORANDUM, UNLESS THE COURT HAS ANY OTHER SPECIFIC

8    QUESTIONS, WE WOULD SUBMIT ON OUR SENTENCING RECOMMENDATION.

9         THE COURT:  THANK YOU.

10        IS THERE ANYTHING YOU WISH TO RESPOND TO?

11        MR. BOURASSA:  YES, YOUR HONOR.  I AGREE WITH SOME OF

12   WHAT THE GOVERNMENT HAS SAID.  I DON'T THINK THAT THE FACT THAT

13   THIS OCCURRED ONLINE MEANS IT IS LESS EGREGIOUS IN A LOT OF

14   WAYS, BUT IT IS DIFFERENT.  THE HARM TO VICTIMS IS DIFFERENT.

15   THE CULPABILITY AND THE ACCESSIBILITY OF THE OFFENSE CHANGES

16   HOW OFFENDERS THINK ABOUT THE COMMISSION OF THE CRIME IN A WAY

17   THAT ISN'T NECESSARILY MITIGATING, BUT IN A WAY THAT INFLUENCES

18   THEIR FUTURE RISKS, FOR EXAMPLE.

19        AND SO I KNOW THE COURT HAS REVIEWED OUR MEMORANDUM

20   CLOSELY.  THE BEST AVAILABLE RESEARCH ON RECIDIVISM FOR

21   OFFENDERS LIKE MR. DASKO INDICATES THAT FOLKS WHO COMMIT CRIMES

22   LIKE THIS ONE ARE A SIGNIFICANTLY LOWER RISK THAN FOLKS WHO

23   COMMITTED PRODUCTION IN THE MANNER THEY HAD TO IN THE 1990S,

24   AND SO THE HARMS HAVE CHANGED.  SO HAVE THE RISKS, AND THAT ALL

25   HAS TO GO INTO THE APPROPRIATE SENTENCE.

```
 1          I HAVEN'T -- I DIDN'T NOTICE -- I ALSO -- I THINK --
 2   EVERYBODY HERE, INCLUDING MR. DASKO, FEELS FOR THE VICTIMS AND
 3   THEIR FAMILIES.  THE -- UNFORTUNATELY, MR. DASKO IS NOT UNIQUE
 4   IN BEING A TEACHER AND A COACH WHO COMMITTED AN OFFENSE LIKE
 5   THIS.  THEY -- IT HAPPENS.  AND IN OUR ATTEMPT TO DETERMINE
 6   WHAT A TYPICAL SENTENCE IS, WE LEARNED THAT IT HAPPENS WITH
 7   SOME FREQUENCY.
 8          NOW, THAT DOESN'T MAKE HIM -- I'M NOT AWARE OF ANY
 9   RESEARCH INDICATING HE'S A HIGHER RISK IN THE FUTURE BECAUSE OF
10   THAT.  AND IN THE CONTEXT OF THOSE CASES THAT ARE THE MOST
11   ANALOGOUS TO MR. DASKO IN DOING OUR BEST -- AND I WISH I HAD
12   HIRED SOMEBODY ELSE TO DO THIS SO THAT THE COURT WOULDN'T EVEN
13   HAVE A LINGERING DOUBT ABOUT THE REPRESENTATIVENESS OF OUR
14   SAMPLE.  BUT WE REALLY DID GO OUT IN GOOD FAITH TO TRY TO FIND
15   OTHER CASES LIKE MR. DASKO'S IN BUILDING, BASICALLY, A DATA SET
16   TO FIGURE OUT WHAT HAPPENS.
17          WE THOUGHT WE MIGHT KEEP IT INTERNAL.  YOU KNOW, LET'S
18   SEE HOW BAD IT IS, WHAT HAPPENS.  AND IN THOSE INSTANCES WITH
19   TEACHERS AND COACHES COMMITTING CHILD PORNOGRAPHY OFFENSES, THE
20   MEDIAN SENTENCE IS EXACTLY WHAT WE ARE ASKING FOR; IT'S 84
21   MONTHS.
22          WHEN THERE'S AN OPPORTUNITY TO SAY 25 YEARS OR 30
23   YEARS OR 40 YEARS IN PRISON, 84 MONTHS SOUNDS LENIENT.  BUT
24   IT'S NOT.  IT'S A SERIOUS SENTENCE, AND THAT'S WHAT WE ARE
25   ASKING THE COURT TO IMPOSE.
```

1          THE COURT:  ALL RIGHT.  WOULD YOU LIKE TO RESPOND,

2     MS. GRIFFITH?

3          MS. GRIFFITH:  I HAVE NO NEED, YOUR HONOR.  THANK YOU.

4          THE COURT:  OKAY.  I'M GOING TO GO OVER THE GUIDELINE

5     CALCULATIONS.  WE BEGIN WITH A BASE OFFENSE LEVEL OF 32.

6     THAT'S INCREASED BY 2 LEVELS BASED ON THE SPECIFIC OFFENSE --

7     GIVE ME ONE MOMENT -- OF THE MINOR BEING AT LEAST 12 YEARS OF

8     AGE, BUT NOT 16 YEARS OF AGE.  IT'S INCREASED BY AN ADDITIONAL

9     2 LEVELS BASED ON DISTRIBUTION.  IT IS INCREASED BY AN

10    ADDITIONAL 2 LEVELS BASED ON USE OF A COMPUTER, BRINGING THE

11    ADJUSTED OFFENSE LEVEL TO A 38.

12         THERE'S A MINUS 3 FOR ACCEPTANCE OF RESPONSIBILITY,

13    BRINGING THE TOTAL OFFENSE LEVEL TO A 35.  WITH ZERO CRIMINAL

14    HISTORY POINTS, SO YOU ARE IN A CATEGORY 1 WITH A RANGE OF 168

15    TO 210 MONTHS.

16         I KEEP THAT GUIDELINE RANGE IN MIND.  I CONSIDER ALL

17    OF THE 3553(A) FACTORS.  I CONSIDER ALL OF THE FACTORS THAT

18    HAVE BEEN DISCUSSED HERE TODAY.  I CONSIDER THE SPECIFIC

19    ARGUMENTS THAT DEFENSE COUNSEL HAS MADE, INCLUDING REQUESTS FOR

20    DEPARTURES UNDER KIMBROUGH AND THE DIFFERENCE BETWEEN THE

21    PRODUCTION, HANDS-ON AND NOT HANDS-ON; INCLUDING THE REQUEST

22    FOR EXPEDITIOUS RESOLUTION; INCLUDING THE REQUEST FOR -- UNDER

23    2X1.1(B); AND THE REQUEST UNDER MENTAL HEALTH AND POST-OFFENSE

24    REHABILITATION.

25         I CONSIDER THE NATURE AND CIRCUMSTANCES OF THIS

1    OFFENSE, YOUR HISTORY AND PERSONAL CHARACTERISTICS, THE NEED

2    FOR SPECIFIC DETERRENCE AND THE NEED FOR GENERAL DETERRENCE, AS

3    WELL AS THE NEED TO PROTECT THE PUBLIC.

4         I FIND THAT A SENTENCE OF 188 MONTHS IS SUFFICIENT BUT

5    NOT GREATER THAN NECESSARY TO COMPLY WITH THE STATUTORY

6    PURPOSES OF SENTENCING.

7         SIR, YOU ARE COMMITTED TO THE CUSTODY OF THE BUREAU OF

8    PRISONS FOR A PERIOD OF 188 MONTHS.

9         FOLLOWING YOUR RELEASE FROM CUSTODY, I AM GOING TO

10   PLACE YOU ON A TERM OF SUPERVISED RELEASE OF 15 YEARS.  THAT IS

11   SUBJECT TO THE STANDARD AND MANDATORY CONDITIONS, WHICH I WILL

12   NOW READ INTO THE RECORD.

13        THE MANDATORY CONDITIONS ARE THAT YOU MUST NOT COMMIT

14   ANOTHER FEDERAL, STATE, OR LOCAL CRIME.  YOU MUST NOT

15   UNLAWFULLY POSSESS A CONTROLLED SUBSTANCE.  YOU MUST NOT

16   ILLEGALLY POSSESS A CONTROLLED SUBSTANCE.  YOU MUST REFRAIN

17   FROM ANY UNLAWFUL USE OF A CONTROLLED SUBSTANCE.

18        YOU MUST MAKE RESTITUTION, WHICH I'M GOING TO DISCUSS

19   IN A MINUTE.  YOU MUST COOPERATE IN THE COLLECTION OF DNA, AS

20   DIRECTED BY THE PROBATION OFFICER.

21        WITH RESPECT TO THE STANDARD CONDITIONS, THEY WILL BE

22   FOUND ON PAGE 4 AND 5 OF YOUR JUDGMENT, AND THAT IS THAT YOU

23   MUST REPORT TO PROBATION IN THE FEDERAL JUDICIAL DISTRICT WHERE

24   YOU ARE AUTHORIZED TO RESIDE WITHIN 72 HOURS OF RELEASE.  AFTER

25   INITIALLY REPORTING TO THE PROBATION OFFICE, YOU WILL RECEIVE

1  INSTRUCTIONS FROM THE COURT OR THE PROBATION OFFICER AS TO HOW

2  AND WHEN TO REPORT.

3  YOU MUST NOT KNOWINGLY LEAVE THE FEDERAL DISTRICT

4  WHERE YOU ARE AUTHORIZED TO LIVE WITHOUT GETTING PERMISSION

5  FROM PROBATION.

6  YOU MUST ANSWER TRUTHFULLY THE QUESTIONS ASKED BY

7  PROBATION.  YOU MUST LIVE AT A PLACE APPROVED BY THE PROBATION

8  OFFICER.  AND IF YOU PLAN TO CHANGE YOUR RESIDENCE, YOU MUST

9  NOTIFY PROBATION WITHIN 72 HOURS OF BECOMING AWARE OF AN

10 EXPECTED CHANGE.

11 YOU MUST ALLOW THE PROBATION OFFICER TO VISIT AT YOUR

12 HOME OR ELSEWHERE, AND YOU MUST PERMIT THE PROBATION OFFICER TO

13 TAKE ITEMS PROHIBITED DURING SUPERVISION.

14 YOU MUST WORK FULL-TIME, AT LEAST 30 HOURS PER WEEK,

15 AT A LAWFUL TYPE OF EMPLOYMENT UNLESS THE PROBATION OFFICER HAS

16 EXCUSED YOU FROM DOING SO.

17 YOU MUST NOT COMMUNICATE OR INTERACT WITH SOMEONE THAT

18 YOU KNOW IS ENGAGED IN CRIMINAL ACTIVITY.

19 IF YOU ARE ARRESTED OR QUESTIONED BY LAW ENFORCEMENT,

20 YOU MUST NOTIFY THE PROBATION OFFICER WITHIN 72 HOURS.

21 YOU MUST NOT OWN, POSSESS, OR HAVE ACCESS TO A

22 FIREARM, AMMUNITION, DESTRUCTIVE DEVICE, OR DANGEROUS WEAPON OR

23 ANYTHING THAT WAS DESIGNED OR MODIFIED FOR THE PURPOSE OF

24 CAUSING BODILY INJURY OR DEATH TO ANOTHER.

25 YOU MUST NOT ACT OR MAKE ANY AGREEMENT WITH A LAW

1    ENFORCEMENT AGENCY TO ACT AS A CONFIDENTIAL SOURCE WITHOUT

2    PERMISSION FROM THE COURT.

3         IF THE PROBATION OFFICER DETERMINES THAT YOU POSE A

4    RISK TO ANOTHER PERSON, THE PROBATION OFFICER MAY REQUIRE THAT

5    YOU NOTIFY THE PERSON ABOUT THE RISK AND YOU MUST COMPLY WITH

6    THAT INSTRUCTION.

7         YOU MUST FOLLOW THE INSTRUCTIONS OF THE PROBATION

8    OFFICER RELATED TO CONDITIONS OF RELEASE.

9         IN ADDITION, YOU MUST COMPLY WITH THE FOLLOWING

10   SPECIAL CONDITIONS:  YOU MUST REPORT ALL VEHICLES OWNED OR

11   OPERATED OR IN WHICH YOU HAVE AN INTEREST TO PROBATION.  YOU

12   MUST SUBMIT YOUR PERSON, PROPERTY, RESIDENCE, ABODE, VEHICLE,

13   PAPERS, COMPUTER, SOCIAL MEDIA ACCOUNTS, AND ANY OTHER

14   ELECTRONIC COMMUNICATIONS OR DATA STORAGE DEVICE FOR MEDIA AND

15   EFFECTS TO A SEARCH AT ANY TIME, WITH OR WITHOUT A WARRANT, BY

16   ANY LAW ENFORCEMENT OR PROBATION OFFICER WHO HAS REASONABLE

17   SUSPICION CONCERNING A VIOLATION OF A CONDITION OF SUPERVISED

18   RELEASE OR UNLAWFUL CONDUCT.

19        YOU MUST CONSENT TO THIRD-PARTY DISCLOSURE TO ANY

20   EMPLOYER, POTENTIAL EMPLOYER, CONCERNING ANY RESTRICTIONS THAT

21   ARE IMPOSED BY THE COURT.

22        YOU MUST NOT USE OR POSSESS ANY COMPUTER,

23   COMPUTER-RELATED DEVICES WHICH ARE CAPABLE OF ACCESSING,

24   STORING, OR TRANSMITTING VISUAL DEPICTIONS OF SEXUALLY EXPLICIT

25   CONDUCT INVOLVING CHILDREN AS DEFINED BY 18 USC 22562 AND/OR

1   ACTUAL SEXUALLY EXPLICIT CONDUCT INVOLVING ADULTS AS DEFINED BY

2   18 USC 2257H1.  SUCH DEVICES INCLUDE, BUT ARE NOT LIMITED TO:

3   SMART PHONES, SMART WATCHES, VIDEO GAME CONSOLES, DIGITAL

4   TABLETS, IPODS, AND NOT EXCLUDING ANYTHING ELSE THAT HAS THE

5   CAPABILITY OF DOING SO IN THE FUTURE AND CAN COMMUNICATE DATA

6   VIA MODEM, DEDICATED CONNECTIONS, OR CELLULAR NETWORKS AND THE

7   PERIPHERAL EQUIPMENT.

8          YOU MUST CONSENT TO INSTALLATION OF MONITORING

9   SOFTWARE AND/OR HARDWARE ON ANY COMPUTER OR COMPUTER-RELATED

10  DEVICE, OR PHONES THAT ARE CONTROLLED BY YOU THAT WILL ENABLE

11  THE PROBATION OFFICER TO MONITOR ALL COMPUTER USE AND CELLULAR

12  DATA.

13         YOU MUST PAY FOR THE COST OF THE INSTALLATION OF THE

14  COMPUTER SOFTWARE.

15         YOU MUST NOT ASSOCIATE WITH OR HAVE ANY CONTACT WITH

16  ANY KNOWN SEX OFFENDERS UNLESS IN AN APPROVED TREATMENT AND/OR

17  COUNSELING SETTING.

18         YOU MUST NOT HAVE ANY CONTACT, DIRECT OR INDIRECT,

19  EITHER TELEPHONICALLY, VISUALLY, VERBALLY, OR THROUGH WRITTEN

20  MATERIAL, OR THROUGH ANY THIRD-PARTY COMMUNICATION WITH THE

21  VICTIM OR THE VICTIM'S FAMILY WITHOUT PRIOR APPROVAL OF THE

22  PROBATION OFFICER.

23         YOU MUST NOT INITIATE ANY CONTACT -- PERSONAL,

24  ELECTRONIC, OR OTHERWISE -- OR ASSOCIATE WITH ANYONE UNDER THE

25  AGE OF 18 UNLESS IN THE PRESENCE OF A SUPERVISING ADULT WHO IS

1    AWARE OF YOUR SEXUAL BEHAVIOR AND NATURE OF OFFENSE AND

2    CONVICTION, WITH THE EXCEPTION OF ANY BIOLOGICAL CHILDREN THAT

3    YOU HAVE OR MAY HAVE, UNLESS APPROVED IN ADVANCE BY THE

4    PROBATION OFFICER.

5         YOU MUST NOT ACCEPT OR COMMENCE EMPLOYMENT OR

6    VOLUNTEER ACTIVITY WITHOUT PRIOR APPROVAL OF THE PROBATION

7    OFFICER, AND EMPLOYMENT SHOULD BE SUBJECT TO CONTINUOUS REVIEW

8    AND ASSESSMENT BY THE PROBATION OFFICER.

9         YOU MUST NOT LOITER WITHIN 200 YARDS OF A SCHOOL,

10   SCHOOL YARD, PLAYGROUND, PARK, AMUSEMENT CENTER OR PARK, PUBLIC

11   SWIMMING POOL, ARCADE, DAYCARE CENTER, CARNIVAL, RECREATION

12   VENUE, LIBRARY, AND OTHER PLACES PRIMARILY FREQUENTED BY

13   PERSONS UNDER THE AGE OF 18 WITHOUT PRIOR APPROVAL OF THE

14   PROBATION OFFICER.

15        YOU MUST NOT POSSESS OR VIEW ANY MATERIALS SUCH AS

16   VIDEOS, MAGAZINES, PHOTOGRAPHS, COMPUTER IMAGES, OR OTHER

17   MATTER THAT DEPICTS SEXUALLY EXPLICIT CONDUCT INVOLVING

18   CHILDREN AS DEFINED BY 18 USC 22562 AND/OR SEXUALLY EXPLICIT

19   CONDUCT INVOLVING ADULTS AS DEFINED BY 18 USC 2257H.1.  AND YOU

20   MUST NOT PATRONIZE ANY PLACE WHERE SUCH MATERIALS OR

21   ENTERTAINMENT ARE THE PRIMARY MATERIAL OR ENTERTAINMENT

22   AVAILABLE.

23        YOU MUST COMPLETE A SEX OFFENDER EVALUATION, WHICH MAY

24   INCLUDE PERIODIC PSYCHOLOGICAL AND PHYSIOLOGICAL TESTING AND

25   COMPLETION OF A VISUAL REACTION TIME ASSESSMENT AT THE

1    DIRECTION OF THE COURT OR THE PROBATION OFFICER.

2            IF DEEMED NECESSARY BY THE TREATMENT PROVIDER, YOU

3    SHALL PARTICIPATE IN AND SUCCESSFULLY COMPLETE THE STATE

4    APPROVED -- STATE-CERTIFIED SEX OFFENDER TREATMENT PROGRAM,

5    INCLUDING COMPLIANCE WITH TREATMENT REQUIREMENTS OF THE

6    PROGRAM.  THE COURT AUTHORIZES THE RELEASE OF THE PRESENTENCE

7    REPORT AND AVAILABLE PSYCHOLOGICAL EVALUATIONS TO THE TREATMENT

8    PROVIDER, AS APPROVED BY THE PROBATION OFFICER.

9            YOU WILL ALLOW RECIPROCAL RELEASE OF INFORMATION

10   BETWEEN THE PROBATION OFFICER AND THE TREATMENT PROVIDER.

11           YOU MAY BE REQUIRED TO CONTRIBUTE TO THE COST OF

12   SERVICES RENDERED IN AN AMOUNT TO BE DETERMINED BY THE

13   PROBATION OFFICER BASED ON ABILITY TO PAY.

14           POLYGRAPH EXAMINATIONS MAY BE USED FOLLOWING

15   COMPLETION OF THE FORMAL TREATMENT PROGRAM AS DIRECTED BY THE

16   PROBATION OFFICER IN ORDER TO MONITOR ADHERENCE TO THE GOALS

17   AND OBJECTIVES OF TREATMENT AND AS PART OF THE CONTAINMENT

18   MODEL.

19           YOU MUST RESIDE IN A RESIDENCE APPROVED IN ADVANCE BY

20   THE PROBATION OFFICER AND ANY CHANGES IN RESIDENCE SHALL BE

21   PREAPPROVED BY THE PROBATION OFFICER.

22           ARE WE ALSO REQUIRING REGISTRATION?

23           MS. GRIFFITH:  YES, YOUR HONOR.  IT'S A BYPRODUCT

24   OF -- I BELIEVE IT IS ONE OF THE SPECIAL CONDITIONS THE COURT

25   CAN CHECK, BUT IT IS BY VIRTUE OF HIS CONVICTION, AND HE'S BEEN

```
 1   ADVISED OF THAT.  WE USUALLY DON'T MAKE IT A SPECIAL CONDITION
 2   OF SUPERVISED RELEASE BECAUSE HE'S REQUIRED TO COMPLY WITH ALL
 3   STATE AND LOCAL LAWS, SO THAT'S SUBSUMED AS PART OF THE SEX
 4   OFFENDER REGISTRATION.
 5        THE COURT:  VERY WELL.  AND I AM JUST LOOKING UNDER
 6   THE STANDARD OR MANDATORY -- YES.  THE DEFENDANT MUST COMPLY
 7   WITH THE REQUIREMENTS OF THE SEX OFFENDER REGISTRATION AND
 8   NOTIFICATION ACT AS DIRECTED BY THE PROBATION OFFICER, THE
 9   BUREAU OF PRISONS, OR ANY STATE SEX OFFENDER REGISTRATION
10   AGENCY IN THE LOCATION WHERE THE DEFENDANT RESIDES, WORKS, IS A
11   STUDENT, OR WAS CONVICTED OF A QUALIFYING OFFENSE.
12        SIR, THOSE ARE THE CONDITIONS OF YOUR RELEASE.  I AM
13   GOING TO IMPOSE -- I AM NOT GOING TO IMPOSE A FINE.
14   RESTITUTION WILL BE IMPOSED AT THE RATE OF $4,000.  I HAVE
15   RECEIVED THE PROPOSED ORDER, AND I WILL ATTACH MY SIGNATURE TO
16   THAT.  THERE WILL BE A $100 SPECIAL ASSESSMENT.
17        NOW, WITH RESPECT TO VOLUNTARY SURRENDER OR --
18        MS. GRIFFITH:  YOUR HONOR, I BELIEVE PRETRIAL IS GOING
19   TO RECOMMEND REMAND.  DEFENSE COUNSEL, I BELIEVE, IS ASKING FOR
20   A TIME SO HE CAN BE DESIGNATED.  WE ARE GOING TO DEFER TO THE
21   COURT.  THE ONLY REQUEST IS IF HE'S NOT REMANDED TODAY, HE ONLY
22   BE GIVEN TWO WEEKS TO SELF-REPORT.  WE DON'T SEE ANY REASON WHY
23   HE SHOULD NEED LONGER THAN THAT.
24        I APPRECIATE HE WOULD PREFER TO BE SELF-DESIGNATED.
25   YOUR HONOR IS FULLY AWARE THAT WE FULLY LITIGATED THE BOND
```

1    ISSUES.  ONE OF THE BIGGEST ISSUES THAT THIS COURT CONSIDERED

2    WHEN RELEASING MR. DASKO ON BOND WAS THE FACT THAT HIS MOTHER

3    NEEDED THE KIDNEY TRANSPLANT.  THE UNITED STATES IS CONCERNED

4    IN LIGHT OF THE LENGTHY SENTENCE THAT HE IS NOW CERTAINLY

5    FACING WITH NO HOPE FOR APPEAL AND THE FACT THAT THE TRANSPLANT

6    HAS ALREADY HAPPENED, THAT HE JUST NEEDS A SHORT WINDOW IF THE

7    COURT IS INCLINED TO LET HIM OUT -- KEEP HIM OUT PENDING HIS

8    DESIGNATION.

9           THE COURT:  THANK YOU.

10          I WOULD LIKE TO HEAR FROM PRETRIAL.  YOUR BASIS FOR

11   REQUESTING A REMAND AT THIS TIME?

12          THE PROBATION OFFICER:  GOOD MORNING, YOUR HONOR.

13   DANIEL KIM FROM U.S. PRETRIAL SERVICES.  BASED ON THE NATURE OF

14   THE CONVICTION, PRETRIAL SERVICES IS REQUESTING THAT MR. DASKO

15   BE REMANDED TODAY.

16          THE COURT:  IS IT BASED ON THE CONVICTION AND THE

17   SENTENCE AND NOT BASED ON ANY SPECIFIC CONDUCT OR MISCONDUCT?

18          THE PROBATION OFFICER:  CORRECT, YOUR HONOR.

19          THE COURT:  ALL RIGHT.  I'M HAPPY TO HEAR FROM YOU,

20   MR. BOURASSA.

21          MR. BOURASSA:  THANK YOU.  WE ARE ASKING THE COURT TO

22   PERMIT, BASICALLY, A DUE COURSE SELF-SURRENDER AFTER HE'S

23   DESIGNATED.  I EXPECT HE IS LIKELY TO BE DESIGNATED TO A

24   FACILITY WITH A SEX OFFENDER TREATMENT PROGRAM.  AND HE -- OF

25   COURSE, HE -- THE COURT -- HE CAME HERE TO COURT TODAY

1  UNDERSTANDING THE GOVERNMENT WAS ASKING FOR A SUBSTANTIAL

2  SENTENCE IN EXCESS OF WHAT THE COURT HAS ULTIMATELY IMPOSED.  I

3  DON'T THINK HE POSES A FLIGHT RISK OR DANGER SUBJECT TO THE

4  CONTINUING ONEROUS CONDITIONS.

5          ON THE FLIP SIDE, THERE IS SUBSTANTIAL DANGER TO HIM

6  BEING HOUSED LOCALLY IN LIGHT OF THE INEVITABLE NEWS COVERAGE

7  FROM HIS CASE AND THE ATTENDANT RISKS FROM THAT.  I HOPE THE

8  COURT UNDERSTANDS THE ATTENDANT RISKS FROM THAT.

9          THE -- HE WOULD BE ABLE TO TRAVEL WHEREVER HE'S

10  DESIGNATED OR, IF NECESSARY, HE COULD SURRENDER LOCALLY TO HAVE

11  THE ANKLE MONITOR REMOVED.  I THINK SOME OF THE LOGISTICS

12  AROUND THE ANKLE MONITOR MAY BE ANIMATING PART OF PRETRIAL'S

13  REQUEST.  CERTAINLY WE CAN WORK OUT THOSE LOGISTICS AND HAVE

14  HIM SURRENDER AT A FUTURE DATE.

15          LAST THING, THE COURT PROBABLY UNDERSTANDS IT ALSO

16  AFFECTS HIS CLASSIFICATION IN THE BUREAU OF PRISONS.

17          THE COURT:  THANK YOU.

18          IS THERE ANYTHING THAT I CAN DO OR THAT YOU CAN DO,

19  MS. GRIFFITH -- AND I'M SURE DEFENSE COUNSEL WOULD ASSIST -- IN

20  ASKING OR REQUESTING THAT THE BUREAU OF PRISONS DO AN

21  EXPEDITIOUS DESIGNATION IN THIS CASE?

22          BECAUSE I UNDERSTAND THE -- I UNDERSTAND THE

23  DEFENSE -- THE GOVERNMENT'S REQUEST FOR TWO WEEKS.  I ALSO

24  UNDERSTAND THE INEVITABLE LIKELIHOOD OF MEDIA COVERAGE AND THE

25  POTENTIAL RISKS AT A LOCAL FACILITY.

1          THAT BEING SAID, I DON'T WANT HIM TO REMAIN OUT.  I

2     DON'T THINK IT'S APPROPRIATE FOR HIM TO REMAIN OUT FOR 6 OR 8

3     WEEKS LIKE WE WOULD NORMALLY DO.

4          IS THERE ANYTHING I CAN INCLUDE IN A JUDGMENT OR

5     ANYTHING AT ALL THAT WE CAN DO TO ASSIST IN THAT END?

6          MS. GRIFFITH:  YOUR HONOR, I'M NOT AWARE OF ANY.  I'M

7     CERTAINLY HAPPY TO REACH OUT TO OUR CONTACT WITH THE BOP AND

8     SEE, BUT I DON'T NECESSARILY KNOW THAT THERE'S ANYTHING UNIQUE

9     ENOUGH IN THIS CASE TO WARRANT IT.

10         I WASN'T INSENSITIVE TO THE CONCERNS THAT MR. BOURASSA

11    RAISED REGARDING MR. DASKO'S SAFETY IF HE WAS TO TURN IN, WHICH

12    IS THE REASON WE ARE ASKING FOR NO MORE THAN TWO WEEKS.

13         WITH ALL DUE RESPECT, THE NEWS COVERAGE CYCLE IS

14    RELATIVELY QUICK.  AND EVEN IF THERE IS PRESS TODAY OR

15    CONTINUING COVERAGE, IN THAT TWO WEEKS IT WOULD BE SUFFICIENTLY

16    DISSIPATED.

17         AGAIN, I APPRECIATE THAT MR. DASKO DID SHOW UP TODAY.

18    BUT THE UNITED STATES, YOU KNOW, FIRMLY BELIEVED HE SHOULD HAVE

19    BEEN IN CUSTODY.  HE REMAINS A DUAL CITIZEN.  I'M ALSO GOING TO

20    JUST POINT OUT THE OPTICS, YOUR HONOR, OF WHERE MR. DASKO

21    CURRENTLY RESIDES IS WHERE AN OFFENDER WAS PROSECUTED IN THIS

22    OFFICE -- NOT A SEX OFFENDER, BUT AN INDIVIDUAL WHO WAS PLACED

23    ON CONDITIONS AND WAS ABLE TO CUT AND RUN, AND SO THAT IS

24    SOMETHING THAT REMAINS A VERY NEAR AND DEAR CONCERN TO THE

25    COMMUNITY WHERE MR. DASKO LIVES AND CERTAINLY TO THE VICTIM'S

1    MOTHER.  I WOULD BE REMISS IF I DIDN'T MENTION THAT.

2         I THINK THE ANSWER, RESPECTFULLY, IS WHAT THE

3    GOVERNMENT'S PROPOSING IS, IF THERE IS NO REMAND TODAY, A

4    SHORTER PERIOD OF DESIGNATION.

5         THE COURT:  ALL RIGHT.  I AM GOING TO ALLOW A

6    VOLUNTARY SURRENDER IN TWO WEEKS.  I UNDERSTAND THE DEFENSE'S

7    CONCERNS, BUT I THINK THE GOVERNMENT'S POSITION IS APPROPRIATE

8    IN THIS CASE.  AND I DO AGREE THAT THE NEWS COVERAGE AND ANY

9    IMPACT OF IT WILL DISSIPATE BY THEN.

10        MR. BOURASSA:  YOUR HONOR, MAY I RESPOND BRIEFLY TO

11   THAT?

12        THE COURT:  ABSOLUTELY.

13        MR. BOURASSA:  AS THE COURT KNOWS FROM PRACTICING, THE

14   PROBLEM BECOMES, WHEN A CELLMATE IS ON THE PHONE AND SAYS, LOOK

15   UP THIS GUY WHO I'M WITH, THE RECENCY OF THE NEWS IS

16   SIGNIFICANTLY LESS THAN JUST THE ABILITY TO SEARCH HIS NAME.

17   AND SO IF THE COURT PERSISTS IN DECLINING YOUR REQUEST FOR 6 TO

18   8 WEEKS, I'D ASK THE COURT TO PUT ON THE JUDGMENT A REQUEST FOR

19   EXPEDITED DESIGNATION.  I DON'T KNOW IF THAT'S POSSIBLE, BUT

20   ANYTHING WE CAN DO TO TRY TO CAUSE THAT.

21        THE COURT:  I WILL DO THAT.  AND ANOTHER QUESTION --

22   AND I DON'T KNOW IF THIS CAN BE ACCOMPLISHED -- IS IN THE EVENT

23   THAT HE IS NOT DESIGNATED IN TWO WEEKS, WHETHER HE COULD

24   SURRENDER IN EL CENTRO?

25        MS. GRIFFITH:  YOUR HONOR, I WILL -- I'M HAPPY TO

1    DEFER TO DEFENSE COUNSEL AND PRETRIAL SERVICES.  I THINK THE

2    ONLY REQUEST THAT PRETRIAL SERVICES WOULD HAVE -- MR. KIM WILL

3    CORRECT ME IF I'M WRONG -- WHEREVER THE SELF-DESIGNATION IS,

4    MAKING SURE ONE OF THE SURETIES IS THERE TO REMOVE THE

5    ELECTRONIC MONITOR.

6          THE COURT:  RIGHT.  I WILL ADDRESS THAT.  I WILL

7    ABSOLUTELY ADDRESS THAT.  BUT IT'S NOT COMPLETELY TAKING

8    THIS -- NOT COMPLETELY ALLEVIATING THE CONCERN, MR. BOURASSA,

9    BUT PERHAPS ANOTHER FACILITY.  I MEAN, I DON'T KNOW IF YOU WANT

10    TO WORK WITH PRETRIAL IF HE'S NOT DESIGNATED AND HAVE HIM

11    SURRENDER IN ANOTHER FACILITY.  I DON'T KNOW IF IT CAN EVEN BE

12    OUT OF OUR DISTRICT.  I MEAN, I KNOW SOMETIMES PEOPLE ARE

13    ARRESTED AND THEY'RE HOUSED IN FACILITIES THAT ARE NOT WITHIN

14    OUR DISTRICT.  BUT I DO THINK THAT THAT IS APPROPRIATE.

15          I WILL LEAVE IT TO THE TWO OF YOU TO WORK -- TO YOU

16    AND MR. DASKO TO WORK WITH PRETRIAL.  PLEASE KEEP MS. GRIFFITH

17    IN THE LOOP AS TO WHERE HE WILL SURRENDER IN THE EVENT THAT

18    HE'S NOT DESIGNATED.

19          AND I WILL REQUIRE THAT THE MONITOR REMAIN IN PLACE

20    AND THAT A FAMILY MEMBER ACCOMPANY HIM FOR THE PURPOSE OF

21    REMOVING THE ELECTRONIC MONITORING DEVICE.

22          MR. KIM?

23          THE PROBATION OFFICER:  YOUR HONOR, BASED ON THAT, WE

24    WOULD REQUEST THAT MR. DASKO REPORT TO PRETRIAL SERVICES PRIOR

25    TO HIS SELF-SURRENDER FOR THE REMOVAL.

1          THE COURT:  VERY WELL.

2          THE PROBATION OFFICER:  THEN WE CAN ESCORT HIM DOWN TO

3    THE MARSHALS.

4          THE COURT:  ANY REASON HE CAN'T REPORT AFTER COURT?

5          MR. BOURASSA:  WELL, YOUR HONOR, THE COURT HAS GIVEN

6    HIM A COUPLE WEEKS TO SURRENDER.

7          BUT WHAT I'LL REPRESENT TO THE COURT IS THAT I'M GOING

8    TO PROBABLY FRANTICALLY LOOK FOR WAYS TO NAVIGATE THIS, AND

9    I'LL RAISE TO THE COURT'S ATTENTION ANYTHING THE COURT CAN DO

10   TO EXPEDITE THE DESIGNATION OR MAKE THE PROCESS SAFER.

11         THE COURT:  I WILL ABSOLUTELY INCLUDE THAT IN MY

12   JUDGMENT, AND MS. GRIFFITH HAS INDICATED SHE WILL ALSO REACH

13   OUT TO THE BUREAU OF PRISONS.

14         ANY REQUEST FOR A REGION FOR DESIGNATION,

15   MR. BOARASSA?

16         MR. BOURASSA:  YOUR HONOR, IF THE COURT WILL RECOMMEND

17   DESIGNATION TO THE WESTERN REGION?

18         I THINK THE PRESENTENCE REPORT WOULD SUFFICIENTLY

19   INDICATE TO THE BOP, BUT IF THE COURT WILL RECOMMEND A

20   DESIGNATION TO AN SOMP FACILITY AS WELL --

21         THE COURT:  YES, I WILL MAKE THAT RECOMMENDATION.

22         MR. BOURASSA:  -- TREATMENT PROGRAM.

23         THE COURT:  THANK YOU.  MR. BOARASSA, IN LIGHT OF THE

24   SENTENCE, HAS APPEAL BEEN WAIVED?

25         MR. BOURASSA:  YES, YOUR HONOR.

1        THE COURT:  AND DO YOU UNDERSTAND, MR. DASKO, THAT YOU

2   HAVE GIVEN UP YOUR RIGHT TO APPEAL OR TO CHALLENGE YOUR

3   CONVICTION AND YOUR SENTENCE?

4        THE DEFENDANT:  YES, YOUR HONOR.

5        MS. GRIFFITH:  YOUR HONOR, ONE OTHER ADMINISTRATIVE

6   ISSUE IS, CONSISTENT WITH THE PLEA AGREEMENT, THE COURT HAS

7   ALREADY SIGNED A PRELIMINARY ORDER OF FORFEITURE REGARDING THE

8   IMAGES AND DEVICES THAT WERE USED.  WE WOULD JUST ASK THE COURT

9   TO ORALLY PRONOUNCE FORFEITURE AS PART OF THIS SENTENCE AND

10  INCLUDE IT WITH THE JUDGMENT AND CONVICTION, AND WE'LL SUBMIT A

11  FINAL ORDER OF FORFEITURE.

12       THE COURT:  YES.  AND I WILL ORALLY GRANT THE REQUEST

13  FOR FORFEITURE OF ALL IMAGES AND EVERYTHING ELSE THAT'S BEEN

14  INCLUDED IN THE PRELIMINARY ORDER OF RESTITUTION.

15       THAT IS ALL FOR TODAY.

16       MS. GRIFFITH:  YOUR HONOR, SHOULD WE SET A REQUIREMENT

17  FOR SELF-SURRENDER AND THEN A LATER BOND EXONERATION DATE?

18       THE COURT:  MY APOLOGIES.  YES.  THANK YOU.

19       THE CLERK:  OCTOBER 3RD.

20       THE COURT:  SIR, YOU MUST SURRENDER NO LATER THAN NOON

21  ON OCTOBER THE 12TH.

22       THE CLERK:  I'M SORRY.  OCTOBER 3RD.

23       THE COURT:  MY APOLOGIES.  NO LATER THAN NOON ON

24  OCTOBER THE 3RD TO EITHER A FACILITY WHERE YOU HAVE BEEN

25  DESIGNATED OR A FACILITY WHERE YOUR LAWYER HAS MADE

1    ARRANGEMENTS FOR YOU TO SURRENDER TO.

2            WE WILL SET A BOND EXONERATION HEARING.

3            THE CLERK:  OCTOBER 10TH AT 10:00.

4            THE COURT:  OCTOBER 10TH AT 10:00 A.M.

5            MR. DASKO, I FULLY UNDERSTAND THAT THERE IS A LOT THAT

6    IS GOING TO GO THROUGH YOUR MIND.  IT HAS BEEN AND IT WILL

7    CONTINUE TO FOR THE NEXT COUPLE OF WEEKS.  I FULLY UNDERSTAND

8    THAT THE SENTENCE I IMPOSED IS SIGNIFICANTLY GREATER THAN THE

9    SENTENCE RECOMMENDED BY YOUR LAWYER.  I ASK THAT YOU COMPLY

10   WITH YOUR CONDITIONS OF RELEASE, MR. DASKO.  IT WOULD BE A

11   GRAVE MISTAKE ON YOUR PART TO VIOLATE ANY OF YOUR CONDITIONS OF

12   RELEASE AT THIS TIME.

13           ANYTHING ELSE FROM THE GOVERNMENT?

14           MS. GRIFFITH:  NO, YOUR HONOR.  THANK YOU.

15           THE COURT:  THANK YOU.  ANYTHING ELSE FROM THE

16   DEFENSE, MR. BOARASSA?

17           MR. BOURASSA:  ONE MOMENT, YOUR HONOR?

18     (CONFERENCE BETWEEN MR. BOARASSA AND THE DEFENDANT OUT OF

19      THE HEARING OF THE COURT REPORTER.)

20           MR. BOURASSA:  NOTHING FROM THE DEFENSE, YOUR HONOR.

21           THE COURT:  THANK YOU.  THAT'S ALL FOR TODAY.

22     (PROCEEDINGS CONCLUDED AT 11:22 A.M.)

23

24

25

1        C E R T I F I C A T E

2            I, VANESSA EVANS, CERTIFY THAT I AM A DULY QUALIFIED
AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED STATES
3   DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND ACCURATE
TRANSCRIPT OF THE PROCEEDINGS AS TAKEN BY ME IN THE
4   ABOVE-ENTITLED MATTER ON SEPTEMBER 19, 2023; AND THAT THE
FORMAT USED COMPLIES WITH THE RULES AND REQUIREMENTS OF THE
5   UNITED STATES JUDICIAL CONFERENCE.

6

7                                    DATED:  AUGUST 18, 2024

8                                    ___S/ VANESSA EVANS_____

9                                    VANESSA EVANS, CSR 12733.
                                     U.S. OFFICIAL COURT REPORTER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25